In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-4093

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT S. LUCE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-05158 — **John J. Tharp, Jr.**, *Judge*.

ARGUED MAY 30, 2017 — DECIDED OCTOBER 23, 2017

Before WOOD, *Chief Judge*, and RIPPLE and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. The Fair Housing Act ("FHA") was enacted in order to increase home ownership. In service of this goal, the Department of Housing and Urban Development ("HUD"), which is statutorily tasked with implementing the FHA, offers insurance to certain mortgage lenders in order to decrease the risk borne by private industry and thus encourage lending. HUD maintains the viability of this

scheme through a number of measures. One such measure prohibits individuals with criminal records from owning, or being employed by, a mortgage company.

The United States brought this action against Robert Luce under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1833a. It alleged that Mr. Luce had defrauded the Government by falsely asserting that he had no criminal history so that his company could participate in the FHA's insurance program. The district court granted summary judgment in favor of the Government.[1]

Mr. Luce now submits that his false certifications were not material and that lingering issues of material fact preclude summary judgment. Furthermore, Mr. Luce urges that the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) ("*Escobar*"), requires that we depart from our traditional "but-for" FCA causation standard. Although we conclude that Mr. Luce's first two submissions are not persuasive, we believe that there is merit to Mr. Luce's view on causation. *Escobar* did not overrule explicitly our circuit precedent, which requires "but-for" rather than proximate causation. Nonetheless, it does provide significant guidance and deserves our respectful and careful consideration, especially when all other circuits to address the issue have chosen a path different from our own.

Accepting *Escobar* as a catalyst, we have reviewed the principles of common-law fraud, the FCA's statutory language, and the rationale of our sister circuits; we now join those

---

[1] The district court had jurisdiction pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1345. Our jurisdiction is premised on 28 U.S.C. § 1291.

courts in holding that proximate cause is the appropriate test. Accordingly, the judgment of the district court as to causation is reversed, and the case is remanded to afford the parties an opportunity to address the merits under the proximate cause standard.

## I

## BACKGROUND

### A.

One of the objectives of the FHA is to insure participating lenders against losses incurred in the home mortgage market. To qualify for FHA insurance, a loan must be made and held by an approved mortgagee. One type of covered lender, or mortgagee, is a "loan correspondent." "A loan correspondent is an entity that has as its principal activity the *origination* of mortgages for sale or transfer to other mortgagees."[2] Loan correspondents may apply for mortgage insurance, but cannot "hold, purchase, or service insured mortgages."[3] Rather, they are tasked primarily with soliciting the mortgagor and verifying employment information, earnings, and assets. In short, a loan correspondent "originate[s] and verif[ies] the initial information on an FHA loan."[4]

---

[2] Gov't's Br. 5 (emphasis added) (citing 24 C.F.R. § 202.8(a)(2)(2009)). We recognize that some loan correspondents have more expansive roles (*e.g.*, direct endorsement authority), but we do not outline those responsibilities because they are not implicated by this appeal.

[3] *Id.* (citing 24 C.F.R. § 202.8(a)(2)(2009)).

[4] R.92-3 at 4 (Geary Dep. 27).

In order to maintain the integrity of the insurance scheme, mortgagees are required to submit a Yearly Verification Report ("V-form") as part of an annual recertification procedure. During the relevant period, the V-forms read as follows:

> I certify that none of the principals, owners, officers, directors, and/or employees of the above named mortgagee are *currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction*, debarment, limited denial of participation, suspension, or civil money penalty by a federal, state, or local government.[5]

The annual submission of this verification is required for continued program participation. Mortgagees are additionally required to file a 92900-A form with each loan; that form contains a similar criminal history verification.[6]

---

[5] R.88-7 at 36 (emphasis added) (capitalization removed).

[6] The 92900-A forms contained the following certification:

> [T]he undersigned lender makes the following Certifications to induce … the Department of Housing and Urban Development-Federal Housing Commissioner to issue a firm commitment for mortgage insurance or a Mortgage Insurance Certificate under the National Housing Act ….

> G. To the best of my knowledge and belief, I and my firm and its principals: … are not presently indicted or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph G(2) of this certification ….

**B.**

Mr. Luce is an attorney who has been employed at various times by the Securities and Exchange Commission and a series of Chicago law firms. Most recently, he was president and owner of his own mortgage company, MDR. Although he owned MDR, he "was not involved in the day-to-day operation of MDR"; rather, he "performed only high-level corporate work on behalf of" the firm.[7]

MDR was a loan correspondent and therefore could originate loans by sending loan applications to a HUD-approved, direct-endorsement mortgagee for underwriting approval prior to closing. The process proceeded roughly as follows:

> 18. MDR loan officers would first talk to potential borrowers to find out what kind of rate they wanted and to learn about the property they wanted to finance. Once the potential borrower decided on the type of mortgage they [sic] wanted, the loan officer would let them [sic] know the rate which MDR would get daily from lenders. The loan officer would then set up an appointment with the borrower, get their w2s, pay stubs, home insurance, lender statement and the necessary documents to process the loan. The loan officer would then complete a loan application … and when the packet was

---

R.87 (Gov't's Rule 56.1 Statement of Material Fact) at 8–9 (alteration in original) (internal quotation marks omitted). Paragraph (G)(2) includes the offense of making false statements. *Id*. at 9.

[7] R.92-10 at 2 (Luce Aff.).

complete, the loan officer would give it to the loan processing department at MDR.

19. The processing department would review the package to make sure all the right documents were in it to send to the lender. … Once the loan applications and other documents … were complete, and the loan file was approved by MDR's processing department, the loan application would be sent to a lender for underwriting.

20. After the loan package was sent to the lender, MDR would get approval from the underwriter. If the lender needed more information, the package would be sent back to the processing department at MDR to gather the information from the loan officer.[8]

For its involvement, MDR received a nominal processing fee of $450 and a commission.

In April 2005, Mr. Luce was indicted in an unrelated matter for wire fraud, mail fraud, making false statements, and obstruction of justice. Following his indictment, Mr. Luce informed James Passi, his son-in-law and MDR Vice President, of the criminal charges. Nonetheless, MDR continued to state on its V-forms and 92900-A forms that its officers were not currently subject to criminal proceedings. Mr. Luce signed the V-forms; his subordinates signed the 92900-A forms.

Almost three years after Mr. Luce's indictment, in early February 2008, Passi provided information related to the

---

[8] R.87 at 5–6 (internal citations omitted); R.99 at 9–10.

pending criminal charges to HUD's Office of Inspector General. A brief investigation ensued, and, on February 25, 2008, the investigator issued a Referral for Suspension/Debarment.[9]

In July 2008, Mr. Luce pleaded guilty to obstruction of justice in the separate criminal proceeding. On or about August 8, 2008, Mr. Luce amended his V-forms to reflect the criminal indictment. Thereafter, Mr. Luce was debarred, and MDR went out of business. During the period between Mr. Luce's April 2005 indictment and the August 2008 V-form amendments, MDR originated 2,500 loans. Approximately 250 of those loans are now in default; 95% of the defaulted loans were refinances of existing loans previously insured by the FHA.

## C.

The United States brought suit against Mr. Luce in July 2011, seeking treble damages and civil penalties under the FCA and the FIRREA. Counts one and two of the complaint alleged violations of the FCA by either submitting false claims or "using a false record or statement to get a false claim paid."[10] Count three of the complaint alleged that Mr. Luce was subject to civil penalties under the FIRREA because he

---

[9] A debarment sanction is imposed for criminal or serious HUD program violations; the sanction excludes an individual, organization and its affiliates from conducting business with any federal agency. *See* Debarments, HUD.GOV, https://www.hud.gov/program_offices/enforcement/debarments (last visited Oct. 2, 2017).

[10] R.1 at 9–10 (capitalization removed).

had "unlawfully, willfully and knowingly made, used, or caused to be made or used, false and fraudulent records, statements, or certifications to HUD" in violation of 18 U.S.C. § 1006, one of the predicate offenses identified in the FIRREA, 12 U.S.C. § 1833a.[11] At bottom, the complaint alleged that Mr. Luce personally lied on the V-forms and that his subordinates lied on the 92900-A forms[12] in order to participate fraudulently in the HUD insurance scheme.

Both parties eventually moved for summary judgment on liability, and, on September 30, 2015, the district court ruled on those motions, finding Mr. Luce liable for the false certifications on the 2006, 2007, and 2008 V-forms. In so doing, it noted that "[t]he FCA provides liability for any person who '(A) knowingly presents … a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'"[13] The court held that there was no question as to Mr. Luce's liability for the false certifications on the relevant V-forms because he had signed those documents while aware of his pending criminal charges. The district court also held that the false certifications on the V-forms were material as a matter of law "[b]ecause the certification on the V-forms constituted fraud in fulfilling a prerequisite to receiving government funds."[14]

---

[11] *Id.* at 11.

[12] The 92900-A forms are not at issue in this appeal. *See infra* note 20.

[13] R.113 at 8 (third alteration in original) (quoting 31 U.S.C. § 3729(a)(1)).

[14] *Id.* at 21.

Finally, the court noted that FIRREA liability requires "a false statement made by 'an officer, agent or employee of or connected in any capacity with' HUD, with intent to defraud or deceive HUD."[15] The court had no trouble determining that, because he had signed the V-forms while aware of his criminal status, "Luce knowingly made false statements on the V-forms with the intent to deceive HUD."[16] Accordingly, "[b]ecause no reasonable jury could find for Luce on the FIRREA claims relating to the V-forms in 2006, 2007 and 2008," the district court also granted summary judgment "to the government on the FIRREA claims for the V-forms from 2006–2008."[17]

The district court declined to impose liability for the 92900-A forms because "the government's evidence [wa]s far too thin to command a conclusion that Luce knew about the requirement to file forms 92900-A."[18] Rather, the court concluded that "[w]hether Luce had actual knowledge or was recklessly or deliberately indifferent to the existence of the 92900-A forms is a credibility determination for a jury that precludes a finding of summary judgment for either party on the 92900-A forms."[19] The district court also held that issues of fact precluded summary judgment on the FIRREA claim related to the 92900-A forms.

---

[15] *Id.* at 22 (quoting 18 U.S.C. § 1006).

[16] *Id.* at 23.

[17] *Id.*

[18] *Id.* at 11.

[19] *Id.* at 12.

Following its entry of summary judgment in favor of the Government on the FCA and FIRREA claims related to the V-forms, the court held a status hearing. During that hearing, the parties discussed the necessity of a trial:

> MR. SHAPIRO: I believe we're going to trial, Judge. We tried to work some stuff out but it hasn't been worked out yet. I will continue to try and work it out with the government short of it, but I think the government would like to set a trial date today.
>
> THE COURT: Okay. And so we're only talking now about the 2005 claims based on the *92-900A* [sic] *forms*, correct?
>
> MS. NORTH [for the Government]: Your Honor, actually we're not. We'll go to trial *and not pursue the 2005 claims and go forward on damages and penalties for what has been decided on summary judgment*.[20]

---

[20] R.156-1 at 2 (emphasis added). Contrary to the Government's present stance, *see* Gov't's Br. 10 n.4, it expressly abandoned any FCA claims based on the 92900-A forms in these representations to the district court. After the status hearing, all parties proceeded on the basis that liability on all claims had been settled and the only issue before the court was damages. Indeed, in its supplemental briefing on *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), *see infra* at 12, the Government stated: "The court's opinion and *ruling as to liability* in its prior decisions is consistent with the holding in *Escobar*." R.136 at 1 (emphasis added).

After further discussion, the court expressed some doubt that there was a factual dispute concerning damages. It therefore decided to allow the Government to submit a summary judgment motion directed to the issue of damages to determine if there was a genuine issue of material fact with respect to "the dollar figures"[21] before it empaneled a jury.

In its motion for summary judgment on damages, the Government argued that it was entitled to "FCA damages of $111,195,477 because that amount is equal to three times HUD's net loss on the 237 loans that Luce's MDR Mortgage Corporation originated between the relevant dates."[22] Mr. Luce opposed summary judgment on various grounds, including that the Government was required to establish "the foreseeability of the damages it claims" and that "[a] reasonable jury could conclude that it was not foreseeable … that he

---

Moreover, following the court's disposition of the Government's motion for summary judgment on damages, the court entered a final judgment. *See* R.143; *see also infra* at 13. Had there been any lingering claims for the court's consideration, it could not have issued a final judgment as to *any* claims unless it "expressly determine[d] that there [wa]s no just reason for delay." Fed. R. Civ. P. 54(b). The district court made no such finding. Instead, both it—and the parties—proceeded in a manner consistent with the fact that the district court definitively had decided all outstanding claims before it.

The Government's present position is particularly untenable given its jurisdictional statement. In it, the Government stated that the district court's November 23, 2016 order was a final judgment on the merits providing grounds for this court's appellate jurisdiction. *See* Gov't's Br. 2.

[21] R.156-1 at 5.

[22] R.123 at 1.

would be responsible for future borrower defaults on 237 loans because of his misrepresentations on the V forms."[23]

Before the district court had the opportunity to rule on the Government's motion for summary judgment on damages, the Supreme Court issued its opinion in *Escobar*, which directly addressed the question of materiality in FCA cases. The district court therefore ordered additional briefing on "the Court's ruling as to liability."[24] In response, Mr. Luce contended that his V-form certifications were not material under *Escobar*. He further argued that *Escobar*'s instruction to apply common-law fraud principles required the application of proximate, rather than but-for, causation.

On November 23, 2016, the district court addressed both *Escobar* and the Government's motion for summary judgment on the question of damages. The court, this time applying the heightened materiality standard articulated in *Escobar*, again found material Mr. Luce's false certifications. The district court also rejected Mr. Luce's argument that *Escobar* impliedly overruled our precedent applying but-for causation and instead required proximate causation in FCA cases. It accordingly found that Mr. Luce's false V-form certifications were the but-for cause of the loss and awarded $10,357,497.69 in damages.[25] "Because Luce would be unable to pay any

---

[23] R.128 at 4, 6 (emphasis removed).

[24] R.132 (Minute Entry).

[25] The district court calculated that number as follows:

> The loss for the 226 refinanced loans is the difference between the amount the FHA guaranteed on the original

amount (on top of the damages and penalty imposed under the FCA), the Court assesse[d] a penalty of zero on the FIRREA violations."[26] A final judgment was entered on November 23, 2016.[27]

## II

### DISCUSSION

We review the district court's grant of summary judgment de novo. *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 894 (7th Cir. 2001). Summary judgment is appropriate when, construing the record in the light most favorable to the nonmoving party, *Canen v. Chapman*, 847 F.3d 407, 412 (7th Cir. 2017), there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016). However, we are "not required to draw every conceivable inference from the record" in favor of the nonmoving party, but "only those inferences that are reasonable." *Schwartz v. State Farm Mut. Auto. Ins. Co.*, 174 F.3d 875, 878 (7th

---

loans and the amount guaranteed upon MDR's refinancing of those loans. For the 11 new loans, the damages are the government's net losses. … The total loss amount for the 237 loans is $3,452,499.23. Trebling the damages, as required per the FCA, Luce is liable for $10,357,497.69 in damages.

R.142 at 8–9 (internal citations omitted). The court also imposed a penalty of $16,500 for the FCA violations. *See id.* at 12.

[26] *Id*. at 11.

[27] *See* R.143.

Cir. 1999) (quoting *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d
232, 236 (7th Cir. 1991)).

**A.**

We turn first to Mr. Luce's contention that his false V-form
certifications were not material under *Escobar*.

**1.**

In *Escobar*, a young woman died after she received mental
health treatment by unlicensed and unsupervised caregivers
at a clinic operated by one of Universal Health Services' sub-
sidiaries. When submitting reimbursement claims to Medi-
caid, however, the clinic had used payment codes that corre-
sponded to services provided by licensed professionals. The
deceased's parents later sued Universal Health Services un-
der an "implied false certification theory of liability," *Escobar*,
136 S. Ct. at 1997; specifically, the Escobars claimed that the
clinic "misrepresented its compliance with mental health fa-
cility requirements that are so central to the provision of men-
tal health counseling that the Medicaid program would not
have paid the[] claims had it known of these violations," *id.* at
2004.

The district court dismissed the complaint on the ground
that none of the regulations that the clinic allegedly violated
was a condition of payment. The First Circuit reversed in part
and remanded. It reasoned that, "[t]o determine whether a
claim is 'false or fraudulent' based on such implicit commu-
nications, … it 'asks simply whether the defendant, in submit-
ting a claim for reimbursement, knowingly misrepresented

compliance with a material precondition of payment.'" *Id.* at 1998 (quoting *United States ex rel. Escobar v. Universal Health Servs.*, 780 F.3d 504, 512 (1st Cir. 2015)). According to the First Circuit, "the regulations themselves 'constitute[d] dispositive evidence of materiality,' because they identified adequate supervision as an 'express and absolute' condition of payment and 'repeated[ly] reference[d]' supervision." *Id.* (alterations in original) (quoting *United States ex rel. Escobar*, 780 F.3d at 514)).

The Supreme Court vacated and remanded. Initially, it agreed with the First Circuit that a plaintiff could recover under the FCA on the basis of an "implied false certification": "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Id.* at 1995. The Court observed that Congress had not defined "false" or "fraudulent" for purpose of the FCA. Nevertheless, the Court continued, "[i]t is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Id.* at 1999 (quoting *Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013)) (alteration in original). "Because common-law fraud has long encompassed certain misrepresentations by omission, 'false or fraudulent claims' include more than just claims containing express falsehoods." *Id.*

Turning to the type of omission that could trigger liability, the Court rejected Universal Health Services' argument that the nondisclosure had to involve program requirements that were "expressly designated as conditions of payment." *Id.* at 1996. "What matters is not the label the Government attaches

to a requirement, but whether the defendant knowingly violated a requirement that *the defendant knows is material* to the Government's payment decision." *Id*. (emphasis added). The Court explained that the "term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" and had "common-law antecedents." *Id*. at 2002 (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)). Regardless of its origin, however, "[u]nder any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id*. at 2002 (quoting 26 Richard A. Lord, Williston on Contracts § 69:12 (4th ed. 2003)) (second alteration in original).

Given this "demanding" standard, *id*. at 2003, the Court concluded that the label attached to a payment requirement "is relevant to but not dispositive of the materiality inquiry," *id*. at 2001. Instead, the Court explained that proof of materiality includes, but is not limited to, "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id*. at 2003. However,

> if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position,

> that is strong evidence that the requirements are
> not material.

*Id*. at 2003–04. Because the Court's interpretation of the statutory requirements differed from that applied by the First Circuit, it vacated the First Circuit's decision and remanded for further proceedings.

## 2.

With this understanding of *Escobar*, we consider whether Mr. Luce's misrepresentations on the V-forms meet the materiality standard.

Here, 24 C.F.R. § 202.5(j)(2) affirmatively prohibits *program participation* by loan correspondents who have had a principal "indicted for, or … convicted of, an offense" bearing on the loan correspondent's integrity. To enforce this prohibition, HUD requires an annual certification of compliance with this requirement so that the loan originator can continue its business relationship with the Government. The certification on the V-form concerns an "eligibility requirement" that flatly prohibits the Government from doing business with individuals who have a criminal record.

HUD's action upon learning of Mr. Luce's indictment and false certifications confirms the centrality of this requirement: It instituted debarment proceedings to end Mr. Luce's participation in the program. It did not simply refuse payment in one instance, but terminated its relationship with the loan

originator so that no future payments could be made.[28] At bottom, the false V-form certifications simply were not "minor or insubstantial" violations. *Id*. at 2003. Rather, they were lies that addressed a foundational part of the Government's mortgage insurance regime, which was designed to avoid the systemic risk posed by unscrupulous loan originators. Mr. Luce, as an attorney with significant experience with the Securities and Exchange Commission, certainly understood this reality, further suggesting a finding of materiality. *See id.* at 2002–03 (explaining that subjective knowledge of the importance attached to the representation by the recipient may serve as the foundation of materiality).

**3.**

Mr. Luce attempts to attack this conclusion by contending that the district court disregarded "evidence that would allow

---

[28] Indeed, the Court made this point in rejecting Universal Health Services' argument that liability should be premised only when a condition of payment is at issue:

> And forcing the Government to expressly designate a provision as a condition of *payment* would create further arbitrariness. Under Universal Health's view, misrepresenting compliance with a requirement that the Government expressly identified as a condition of payment could expose a defendant to liability. Yet, under this theory, misrepresenting compliance with a condition of eligibility to even participate in a federal program when submitting a claim would not.

*Escobar*, 136 S. Ct. at 2002.

a reasonable jury to conclude that the V-Forms were not material,"[29] including:

> (1) the Government's approval of insurance on new loans originated by MDR after learning of the V-Forms and Mr. Luce's pending charges; (2) allowing MDR to continue operating as a loan correspondent for two years (2005 and 2006) when no V-Forms were on file; (3) the fact that the V-Forms were not considered when making the decision to insure any specific loan; and (4) HUD's decision to stop regulating loan correspondents entirely.[30]

We cannot agree.

First, the Government's actions following its discovery of his fraud support, rather than undercut, a finding of materiality. Although new loans were issued, the Government also

---

[29] Appellant's Br. 15. Mr. Luce also continues to argue that he did not knowingly make a false statement. According to Mr. Luce, the district court "improperly [found] scienter proven as a matter of law by making credibility determinations about Mr. Luce's testimony." *Id*. at 16. Specifically, he makes a linguistic argument that, because the V-form certifications only speak to "a proceeding … that *could* result … in a criminal conviction," R.88-7 at 36, and he believed himself to be innocent, he did not knowingly make a false statement. Reply Br. 22–24. We cannot accept this submission. The V-forms ask whether Mr. Luce *could* be convicted, not whether he *should* or *would* be convicted. Furthermore, even if Mr. Luce subjectively believed himself to be innocent, the FCA's knowledge requirement is met by "deliberate ignorance" or "reckless disregard" of the truth. 31 U.S.C. § 3729 (b)(1)(ii)–(iii). Both are present here.

[30] Appellant's Br. 15.

began debarment proceedings, culminating in actual debarment. There was no prolonged period of acquiescence.

Second, Mr. Luce's contention that HUD allowed MDR to operate without V-forms for two years is simply not supported by the evidence. Although the V-form for 2006 could not be located, the Government submitted undisputed evidence that, had MDR failed to submit the V-form, HUD would have terminated MDR's FHA-approval.[31]

---

[31] *See* R.100-1 at 17 (Second Declaration of Julie Shaffer, Director of HUD's Philadelphia Home Ownership Center). Mr. Luce also maintains that the Government failed to establish that he signed and submitted a 2006 V-form. *See* Appellant's Br. 16. We disagree. "The standard for summary judgment is well established: with the court drawing all inferences in the light most favorable to the non-moving party, the moving party must discharge its burden of showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). Thereafter, "[i]f the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Id.*

Here, the Government moved for summary judgment, arguing that Mr. Luce filed a 2006 V-form. The Government could not locate the form, so it introduced (1) evidence that MDR had paid an associated registration fee in 2006, in addition to (2) the declaration of Director Shaffer, who stated that the 2006 form must have been received "because HUD would have terminated MDR's FHA-approval had it not submitted the V-form." R.100-1 at 17. This shifted the burden of production to Mr. Luce.

In support of his burden, Mr. Luce submits that (1) the Government has failed to locate the actual V-form, (2) a Government witness did not recall seeing a V-form in 2006, and (3) Passi was in charge of day-to-day operations at MDR during the relevant time period, so he may have signed the form. *See* Reply Br. 24. Addressing these arguments in order, the first does not sufficiently counter the Government's production of payment

Third, Mr. Luce's argument that the certification was not tied to *any particular* loan misses the mark; the V-form certification was a threshold eligibility requirement that, by extension, was tied to *every* loan. That is to say, without the V-form, he could not have originated a single mortgage.

Finally, the contention that HUD stopped regulating loan correspondents in 2010 is simply inaccurate. Rather, the 2010 amendments required that loan correspondents seek a sponsorship relationship with approved mortgagees, who in turn

---

records and the affidavit of Director Schaffer; rather, it simply states the Government has failed to meet its burden, which is insufficient. *See Szymanski v. Rite-Way Lawn Maint. Co.*, 231 F.3d 360, 364 (7th Cir. 2000) ("[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)) (alteration in original)). As to the second argument, the fact that a Government witness did not recall seeing the form is tangential to the actual question—whether the form, in fact, was submitted.

Finally, as to the possibility that someone else signed the form, this argument is countered by the submission of the 2003, 2004, 2007, and 2008 forms, which all carried Mr. Luce's signature. We have emphasized that a party "cannot thwart summary judgment by asking a court to make inferences based on flights of fancy." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 508 (7th Cir. 2010). It is difficult to see how Mr. Luce's argument that Passi *may* have signed the 2006 V-form is anything other than a "flight[] of fancy" given that all of the other V-forms in the record contained Mr. Luce's signature and given that Mr. Luce refused to testify that he did not sign a 2006 V-form. Notably, Passi (the very individual Mr. Luce contends committed fraud by signing the 2006 V-form) voluntarily alerted the authorities to MDR's fraud. The district court accordingly was correct in granting summary judgment as to the 2006 V-form.

assume responsibility for the loan correspondents.[32] This structural shift in no way suggests that the actions of loan correspondents are not material; if anything, it demonstrates that their actions are of sufficient import that further supervision by an intermediary is required.

The district court did not err in finding that Mr. Luce's false certification on the V-form was material as a matter of law.

**B.**

Having approved the district court's finding of materiality under *Escobar*, we now turn to the issue at the heart of this appeal: whether *Escobar* requires that we depart from our traditional causation test for FCA cases. Twenty-five years ago, our court created a conflict among the circuits by holding in

---

[32] Federal Housing Administration: Continuation of FHA Reform; Strengthening Risk Management Through Responsible FHA-Approved Lenders, 75 Fed. Reg. 20,717 (Apr. 20, 2010) (to be codified at 24 C.F.R. pt. 202). In particular, the Government explained that,

> Loan correspondents will no longer be approved participants in FHA programs. Loan correspondents, however, will continue to have the opportunity to participate in FHA programs as third-party originators (TPOs) through sponsorship by FHA-approved mortgagees, as is currently the case, or through application to be approved as an FHA-approved mortgagee. In eliminating FHA's approval of loan correspondents, FHA-approved mortgagees assume full responsibility to ensure that a sponsored loan correspondent adheres to FHA's loan origination and processing requirements.

*Id.* at 20,718.

*United States v. First National Bank of Cicero*, 957 F.2d 1362 (7th Cir. 1992) ("*Cicero*"), that the FCA requires a "but-for" causation test rather than a proximate causation test. In *Cicero*, a bank forwarded a guaranteed loan application to the Small Business Administration ("SBA"); the application contained many falsehoods. When the loan was not repaid, the bank sought, and received, reimbursement on the guarantee from the SBA. The United States later sought to recover the payment of the guarantee. Its action was predicated on, among other bases, the FCA. It argued that, if the bank had not submitted the original loan guarantee application to the SBA, the money never would have been disbursed and the Government would not have incurred its loss. In short, the Government's loss did not have to be attributed directly to the bank's false statement.

In *Cicero*, the court focused on the language of the statute. The FCA allows the Government to recover "3 times the amount of damages which the Government sustains *because of the act of that person*." 31 U.S.C. § 3729(a)(1) (emphasis added). The court emphasized that the statute permits recovery of damages that arise "because of" a fraud, not damages "'occasioned by the cause of the falsity of the claim.'" *Cicero*, 957 F.2d at 1374 (quoting *United States v. Hibbs*, 568 F.2d 347, 354 (3d Cir. 1977) (Meanor, J., dissenting)). In its view, this language justified a broad "but for" causality standard for the question of causation. *Id.* We held that, even if the Government's loss was not caused directly by the false application for a guaranteed loan, the FCA claim was valid because the claim for reimbursement would not have been made if the bank had not transmitted, at an earlier date, the false loan application.

Importantly, the opinion in *Cicero* expressly acknowl-
edged, and disagreed with, the Third Circuit's earlier con-
trary holding in *United States v. Hibbs*, 568 F.2d 347 (3d Cir.
1977). That case held that "a causal connection must be shown
between loss and fraudulent conduct and that a broad 'but
for' test is not in compliance with the statute." *Id*. at 349.[33] In
arriving at that conclusion, the Third Circuit also had focused
on the statutory language, but had reached an entirely differ-
ent result. It reasoned that

---

[33] *United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977), involved "a real estate
broker who submitted certifications to the Federal Housing Administra-
tion misrepresenting the condition of certain residential properties." *Id*. at
349. Specifically, "Hibbs procured and filed certificates stating that the
plumbing, electrical and heating systems of six houses in Philadelphia met
the standards and conditions prescribed by [HUD] regulations," despite
the fact that "there were deficiencies." *Id.* Relying on the false certifica-
tions, the agency "then insured mortgages on the homes and was later
required to pay the mortgages when defaults occurred." *Id.*

Hibbs lost in the district court, but nonetheless won reversal on ap-
peal. In reversing, the Third Circuit held that "a causal connection must
be shown between loss and fraudulent conduct." *Id*. The court therefore
held that the "damages were sustained by the United States because of
defaults by the mortgagors and to some extent were increased by the un-
expected diminution of property value caused by [a] lead paint injunc-
tion," but emphasized that "[n]either of those events was caused by or
related to the false certifications." *Id.* at 351. At bottom, the court was con-
vinced that "precisely the same loss would have been suffered by the gov-
ernment had the certifications been accurate and truthful." *Id.*

> [t]he statutory limitation, "by reason of"[34] the commission of the unlawful act, compels consideration of the element of causation. That requirement should be liberally construed so as to provide the government restitution from those whose fraud has caused loss. It should not, however, be disregarded completely so as to eliminate the relationship between the unlawful act and the injury ultimately sustained.

*Id.* at 351. The court additionally was concerned with the inequitable result that naturally would flow from a different rule of causation:

> To further illustrate the extreme to which the government's argument would lead—if the mortgagors had defaulted because their houses had been destroyed by a flood or some other uninsured catastrophe, the government's theory would nevertheless hold Hibbs liable because he failed to call its attention to defects in the plumbing.

*Id*. In the twenty-five years since we handed down our opinion in *Cicero*, two additional circuits have adopted proximate causation. No circuit has endorsed our view.

---

[34] We have noted that "[a] 1982 amendment to the statute replaced the words 'by reason of the doing or committing' with the word 'because.'" *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1373 n.11 (7th Cir. 1992). We have declined to give this change in language any substantive effect, instead "assum[ing] that the Act's meaning as to the causation requirement was unchanged by the 1982 amendment." *Id.*

With this background in mind, Mr. Luce submits that the "but-for" test employed by the district court to establish causation, although consonant with this circuit's precedent in *Cicero*, is based on an erroneous interpretation of the FCA. He argues that we ought to adopt the proximate cause test adopted by the other circuits that have faced the question. Realizing that stare decisis concerns present a barrier to such a course, he submits that "[t]he Supreme Court's decision in *Escobar* declared the necessity of applying common-law fraud requirements in FCA cases."[35] Mr. Luce contends that "[c]ommon-law fraud claims do not use 'but for' causation when evaluating a defendant's liability; rather, it is necessary for a plaintiff to prove 'proximate' causation."[36] He accordingly concludes that our but-for test "is no longer viable following *Escobar*'s imperative to apply common-law fraud principles in FCA cases."[37]

We begin our causation analysis where Mr. Luce's argument ends and find it unnecessary to say whether *Escobar*, standing alone, would warrant our revisiting this issue. Nothing in that opinion directly addresses the question of FCA causation or the circuit split; rather, that opinion clearly focuses on the implied certification theory of liability and requires that courts undertake a rigorous materiality inquiry. *See Escobar*, 136 S. Ct. at 1995, 1996, 1999–2004. It does not address causation.

---

[35] Appellant's Br. 17.

[36] *Id*.

[37] *Id*. at 19.

Nonetheless, *Escobar* does give us pause. The Court *explicitly* said that, "absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses" and that "the term 'fraudulent' is a paradigmatic example of a statutory term that incorporates the common-law meaning of fraud." *Id.* at 1999 (internal citations omitted).[38] These two statements, read together, require a careful reevaluation of our FCA precedent with particular focus on the common-law understanding of fraud, the FCA's language, and our sister circuits' understanding of causation.

Generally, under the common law, "[a] fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." Restatement (Second) of Torts § 548A (Am. Law. Inst. 1977). Nonetheless, "[n]ot all losses that in fact result from the reliance are … legally caused by the representation." *Id.* cmt. A. Instead, "the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates." *Id.* We similarly have explained, while analyzing the common law of negligence, that

> [p]roximate cause encompasses both cause in fact and legal cause. To establish cause in fact, the plaintiff must show the defendant's "conduct was a material element and a substantial

---

[38] *See also Bank of Am. Corp. v. City of Miami,* 137 S. Ct. 1296, 1305 (2017) ("We assume Congress 'is familiar with the common-law rule and does not mean to displace it *sub silentio*' in federal causes of action." (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 134 S. Ct. 1377, 1390 (2014)).

> factor in bringing about the injury." Legal cause
> on the other hand, "is essentially a question of
> foresee-ability," and we must determine
> "whether the injury is of a type that a reasonable
> person would see *as a likely result* of his or her
> conduct."

*Blood v. VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012) (internal citations omitted).

The statutory language of the FCA does not suggest that Congress sought to depart from the established common-law understanding of causation in fraud cases. The FCA simply allows the Government to recover "damages which the Government sustains *because of* the act of that person." 31 U.S.C. § 3729(a)(1) (emphasis added). Although the phrase "because of" clearly requires causation,[39] nothing in the FCA contains

---

[39] We note that the Supreme Court has interpreted the phrase "because of" as requiring but-for causation in other circumstances. For example, in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Court held that

> the ordinary meaning of the ADEA's requirement that an
> employer took adverse action "because of" age is that age
> was the "reason" that the employer decided to act. To es-
> tablish a disparate-treatment claim under the plain lan-
> guage of the ADEA, therefore, a plaintiff must prove that
> age was the "but-for" cause of the employer's adverse de-
> cision.

*Id.* at 176 (internal citation omitted). Nonetheless, these cases do not inform our analysis because they do not involve statutory codifications of common-law concepts; rather, they involve statutory protections enacted to protect interests not implicated by the common law.

any indication of an intent to depart from the common-law understanding of causation in fraud cases.[40]

We further note that proximate causation comports with the FCA's statutory purpose. The proximate causation standard "separates the wheat from the chaff, allowing FCA claims to proceed against parties who can fairly be said to have caused a claim to be presented to the government, while winnowing out those claims with only attenuated links between

---

[40] The only possible authority indicating congressional displeasure with proximate causation is from a 1986 Senate Report, which reads as follows:

> When the Government changes its position, and commits its financial resources based upon a material false statement, it should be able to recover the resulting losses, but, under some court interpretations, it may not. For instance, in *United States v. Hibbs*, 568 F.2d 347 (3rd Cir. 1977), the FHA agreed to insure a mortgage based upon a representation, which was false, that the residence was habitable and in compliance with the housing code. The Government will not issue insurance to a non-code-conforming house. However, the court ruled that the default on the mortgage occurred because the borrower lost his job, and therefore could not meet his monthly payments—that the default was not related to the false statement. *While the court may have been technically correct, the Committee believes that this position is unsound public policy.* The act should cover representations which cause the Government to change its position and pledge its full faith and credit, including the risk of insurable loss, based upon another, but material false statement.

S. Rep. No. 99-345, at 20 (1986) (emphasis added). As an initial matter, we are not convinced that the above is a direct criticism of proximate cause. Nevertheless, even if it were, Congress did nothing to amend the statute's language to suggest that it intended to depart from the common law. It accordingly does nothing to alter meaningfully our conclusion.

the defendants' specific actions and the presentation of the false claim." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714 (10th Cir. 2006).

Given these considerations, it is not surprising that the clear weight of authority among our sister circuits supports the view that "but for" does not fulfill adequately the causation requirement of the statute. Following *Hibbs*, the Fifth Circuit expressly adopted the Third Circuit's analysis, noting that

> the Third Circuit's reasoning was based upon the phrase in § 231 that anyone violating the Act shall pay to the United States "double the amount of damages which the United States may have sustained *by reason of the doing or committing such* act." … The Third Circuit held that the default which occurred in that case had not been related to the false statements regarding the conditions of certain residential property.
>
>     …
>
> This court finds no error in the decision[] in *Hibbs* …. The language of the statute clearly requires that before the United States may recover double damages, it must demonstrate the element of causation between the false statements and the loss.

*United States v. Miller*, 645 F.2d 473, 475–76 (5th Cir. 1981).[41] Similarly, despite our intervening decision in *Cicero*, the D.C. Circuit adopted the rule articulated in *Hibbs* and *Miller*, and saw little reason to elaborate further on the explanation of the other circuits:

> PRC further points to several circuits that have concluded that the Act does not contemplate liability for all damages that would not have arisen "but for" the false statement. *See United States v. Miller*, 645 F.2d 473, 475–76 (5th

---

[41] In *United States v. Miller*, 645 F.2d 473 (5th Cir. 1981), a number of real-estate companies, construction companies, and mortgage companies were accused of filing inaccurate mortgage applications. In particular, "[e]ach application filed on behalf of the purchasers of homes contained materially false statements as to the credit worthiness and net worth of [the] home buyers, the amount of down payment which each home buyer would make and their past and present debts." *Id.* at 474. The district court dismissed the complaint, and the Government appealed.

In reversing the district court's dismissal, the Fifth Circuit held that "it is clear that [the complaint] does present a set of facts which could entitle the United States to relief." *Id.* at 476. In particular, the court noted that "[f]alse statements regarding residential property may not reasonably be a cause for subsequent defaults of mortgagors, as was the case in *Hibbs*." *Id.* "Nonetheless," the court continued, "false statements regarding the ability of purchasers to afford housing could very well be the major factor for subsequent defaults." *Id.* Accordingly, the appellate court concluded that "the district court erred in dismissing the complaint against the developers since the government has clearly alleged the necessary causation factor." *Id.*; *see also United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) (holding that false certification denying that admissions recruiters received fees contingent on enrolling students caused Government loss even though a phase two application from a student is also necessary before Government funds are paid).

> Cir. 1981); *United States v. Hibbs*, 568 F.2d 347,
> 351 (3d Cir. 1977). Surely, we agree.

*United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 200 (D.C. Cir. 1995). Finally, more recently, the Tenth Circuit expressly approved of the Third Circuit's reasoning in *Hibbs*, noting that the "proximate causation standard strikes the proper analytical balance and comports with the rule requiring strict construction of punitive civil statutes." *Sikkenga*, 472 F.3d at 715 n.17.[42] At bottom, in contrast to *Cicero*'s but-for causation test, each of these four circuits has adopted the common-law understanding of foreseeable, or proximate, causation with respect to the imposition of liability and damages under the FCA. None of these decisions can live in peace with *Cicero.*

In the years since, an increasing number of our sister circuits have adopted expressly proximate causation as a rule more compatible with the statute's language and purpose. The Supreme Court, as well, has provided new guidance on

---

[42] In *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006), the Tenth Circuit was not assessing the relationship between an alleged misrepresentation and loss—as we are here and as the Third and Fifth Circuits did in *Hibbs* and *Miller*, respectively. Instead, the Tenth Circuit was assessing whether Regence, the Medicare carrier for Utah, had caused a Medicare provider, ARUP, to present a false or fraudulent claim for purposes of 31 U.S.C. § 3729(a)(1). *See id*. at 730. It is in this context that the Tenth Circuit determined that proximate causation was appropriate. The fact that the Tenth Circuit (like the Supreme Court in *Escobar*) invoked common-law principles of causation and also explicitly approved of the Third Circuit's analysis in *Hibbs*, supports the view that proximate cause is the appropriate standard for the determination of loss as well.

how we ought to interpret congressional enactments dealing with fraud: Absent other direction from Congress, we should assume that Congress did not stray far from the established common law. Most importantly, our own reading of the statutory language now convinces us that the course charted by our sister circuits is the correct reading of the statutory text. We accordingly overrule *Cicero* and adopt the proximate cause standard for FCA cases. [43]

## C.

There remains the issue of whether, under the proximate cause standard that we have enunciated today, the Government can establish that Mr. Luce's falsehood was the proximate cause of the Government's harm. Our examination of the proceedings in the district court convinces us that this issue was not adequately developed by the parties. The proper course, therefore, is to remand this action to allow the district court to evaluate the evidence according to the new prevailing standard of proximate causation.[44]

---

[43] Because this opinion overrules circuit precedent, we have circulated it to all judges in active service in accordance with Circuit Rule 40(e). No judge favored rehearing en banc.

[44] In addition to Mr. Luce's proximate cause argument, he also submits that the amount of his damages should be reduced because "the district court erred in awarding damages for loans approved for insurance after February 25, 2008, the date on which the Government indisputably had full knowledge of Mr. Luce's pending charges and the representations on the V-Forms." Appellant's Br. 16. He submits that he "is entitled to judgment with respect to 73 of the loans that form the basis for the Government's claims that were endorsed for insurance after February 25, 2008,"

**Conclusion**

We reverse the district court's judgment with respect to causation and remand the case for further proceedings in conformity with this opinion. Mr. Luce shall recover the costs of this appeal.

REVERSED in part and REMANDED

which represents, after trebling, $1,992,686.34. *Id*. at 46. Because Mr. Luce's argument, at bottom, concerns the damages for which he is responsible, we believe that this argument is best directed to the district court as part of its consideration of which, if any, losses were proximately caused by Mr. Luce's misrepresentations.