In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 21-3326, 21-3352, 21-3361, 22-1012, & 22-1075

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHAD GRIFFIN, MATTHEW SMITH, KELLY ISLEY, KERRI AGEE, and NICOLE SMITH, also known as NICOLE SMITH-KELSO,

*Defendants-Appellants.*

———————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cr-00103 — **Tanya Walton Pratt**, *Chief Judge.*

———————

ARGUED FEBRUARY 16, 2023 — DECIDED AUGUST 7, 2023

———————

Before RIPPLE, SCUDDER, and ST. EVE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* A jury convicted Chad Griffin, Matthew Smith, Kelly Isley, Kerri Agee, and Nicole Smith[1] (together, the "defendants") for their roles in a scheme to

---

[1] Nicole Smith's name also appears in the record as Nicole Smith-Kelso or Nicole Kelso.

defraud the Small Business Administration ("SBA"). The defendants now challenge their convictions and sentences on multiple grounds, some of which they raise jointly and some of which individual defendants raise independently.

We affirm the convictions of all five defendants. We also affirm the sentences of all defendants in all respects except one; we conclude that a clerical error in a supervised release condition in Mr. Griffin's amended judgment should be corrected. We make this correction by modifying the judgment.

## I

## BACKGROUND

### A

To help small businesses access credit, the SBA provides guarantees on certain loans made to small businesses. Each guarantee represents a conditional but concrete commitment of government funds. To obtain an SBA guarantee, a borrower must comply with the SBA's guidelines and requirements. The SBA, for example, has certain requirements for borrower eligibility and prohibits the loan proceeds from being used for various purposes.

At the center of this case are two relevant guarantee programs administered by the SBA. The first, and most common, guarantee program is the SBA's standard 7(a) program. To apply for a 7(a) guarantee, the lender and the borrower must provide details about the borrower's financial condition and the proposed uses of the loan proceeds. SBA loan specialists then review the applications for compliance with SBA rules.

The second program involved in this case is the SBA's Express Program, which is designed for smaller loans. Under

this program, the SBA authorizes participating banks to issue SBA guarantees for new loans on behalf of the SBA as long as relevant SBA guidelines are followed. Under this program, the SBA conducts little to no review of the loan or the accompanying paperwork before the loan authorization is issued. Notably, borrowers screened out for a 7(a) loan are not allowed to resubmit for an Express loan.

If a borrower defaults on a loan guaranteed by the SBA, the lender submits a purchase request to the SBA, asking the SBA to purchase the outstanding balance of the defaulted loan. The SBA then decides whether to honor the guarantee. In making its decision, the SBA reviews the purchase request paperwork to ensure that the loan complied with SBA requirements. The SBA can decline to pay a portion of the guaranteed amount (a "repair") or the entire guaranteed amount (a "denial") if it determines that the loan was partly or wholly ineligible for an SBA guarantee.

A lender can retain a lending service provider ("LSP") to package, originate, disburse, service, or liquidate SBA-guaranteed loans on the lender's behalf. In carrying out any of these tasks, the LSP acts as the lender's agent and represents the lender before the SBA. The five defendants in this case worked at, or with, Banc-Serv Partners, LLP ("Banc-Serv"), an LSP. Ms. Agee was the founder, president, and chief executive officer. Ms. Isley was the chief operating officer. Ms. Smith was a relationship manager. Mr. Griffin was an administrative assistant, then a relationship manager, and then the chief marketing officer. Mr. Smith was a co-founder and co-owner of Banc-Serv with Ms. Agee before leaving to be a managing director of Bridge Business Bancorp ("BBB"),

a lender that worked with Banc-Serv to obtain SBA-guaranteed loans.

According to the Government's case, through their work with Banc-Serv, the defendants engaged in a scheme to obtain SBA guarantees for loans that did not meet the SBA's guidelines and requirements. They made false statements on loan-guarantee applications and purchase requests sent to the SBA about matters such as borrowers' eligibility to receive a loan and how loan proceeds would be disbursed. For example, they worked to obtain SBA-guaranteed financing for uses the SBA deemed ineligible, such as paying off past-due payroll taxes and personal debt, by falsely designating the loan proceeds going to those ineligible uses as "working capital," or capital to cover a business's normal operating expenses. The defendants also submitted applications through the Express Program for loans and borrowers that the SBA previously had deemed ineligible. The defendants then renewed their misrepresentations in the paperwork they submitted as part of the purchase requests they sent to the SBA.

**B**

A grand jury indicted the five defendants in connection with their roles in the scheme to defraud the SBA. The original indictment contained thirteen counts.[2] The second amended indictment, the operative indictment in this case, contained

---

[2] Ms. Agee, Ms. Isley, Ms. Smith, and Mr. Griffin filed motions to dismiss this indictment. The district court dismissed Counts 5 and 13 as to Ms. Smith and Ms. Isley. The court merged Counts 7 and 8 as well as Counts 9 and 10. The court denied the motion to dismiss as to the remainder of the indictment. The Government then filed an unopposed motion to dismiss Counts 6 through 11, which the district court granted.

five counts. Count 1 charged all five defendants with conspiracy to commit wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1349. Counts 2 through 5 charged wire fraud affecting a financial institution, in violation of 18 U.S.C. §§ 1343 and 2. Counts 2 and 4 charged Ms. Agee, Ms. Isley, and Ms. Smith, while Counts 3 and 5 charged Ms. Agee only.

The district court conducted an eight-day jury trial. The court denied the defendants' motions for acquittal made both after the close of the Government's case and after the defendants rested. The jury convicted the defendants on all counts, except that Mr. Smith was found guilty of only the lesser-included offense of conspiracy to commit wire fraud.

After the jury verdict, the defendants renewed their motions for judgment of acquittal. The district court denied the defendants' motions. The court first concluded that acquittal was not warranted for Ms. Agee, Ms. Isley, Ms. Smith, or Mr. Griffin because, given the "lengthy trial testimony and the numerous exhibits," there was "relevant evidence from which the jury could reasonably find each of the Defendants guilty beyond a reasonable doubt."[3] The court explained that "the evidence of a scheme to defraud the SBA (the object of the conspiracy) was overwhelming" because the misrepresentations in the presented loan documents "were aimed at acquiring the money and property of the SBA both in the form of the valuable guarantees as well as payment on those guarantees on the back end."[4] As part of the scheme, the defendants routinely sent interstate wire communications from

---

[3] R.297 at 6.

[4] *Id.* at 5.

Banc-Serv in Indiana to SBA offices in Virginia and California. The court also explained that, "[f]or most of the loans discussed at trial, a financial institution was put at a risk of loss," as "[t]he parties stipulated that the banks at issue … were all qualifying financial institutions" and "[t]he banks' risk was clear from the testimony of the SBA witnesses and a lender who all said that the bank that made the loan would be the one that could be charged a repair or a complete denial of the guarantee."[5] The defendants' communications "showed their understanding of the SBA's rules and regulations and how they would circumvent those rules and regulations by changing information on documents to get the SBA's approval."[6] The district court also concluded that an acquittal for Mr. Smith was not warranted. The court explained that the record was "not devoid of any evidence from which the jury could find" him guilty beyond a reasonable doubt of conspiracy to commit wire fraud, noting that neither it nor the jury was required to "examine each shred of evidence in isolation."[7]

The Probation Office prepared a Presentence Investigation Report ("PSR") for each defendant. The defendants objected to the increase in offense level under U.S.S.G. § 2B1.1(b)(1) based on loss amount. The PSRs concluded that the proper measure of actual loss was the amount that the SBA spent purchasing the outstanding balances of the fraudulent SBA-

---

[5] *Id.* at 5–6. The parties stipulated that BBB was a lending institution but not a financial institution within the meaning of 18 U.S.C. § 20.

[6] *Id.* at 6.

[7] *Id.* at 10.

guaranteed loans on which the borrowers had defaulted. The defendants contended that their conduct was not the legal cause of the SBA's purported loss because their actions did not affect the borrower's creditworthiness or the SBA's willingness to guarantee a loan. They also argued that the loss amount attributed to the defendants was incorrect under the government benefits rule. The defendants objected to the restitution amount on the same grounds as the loss amount. The defendants also objected to the application of the sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(10)(C).

At each defendant's sentencing hearing, the district court adopted the Probation Office's calculation of the loss amount attributable to the defendant. The court determined that the actual loss amount for Ms. Agee, Ms. Isley, and Ms. Smith was $2,289,681.30 based on the involvement of each with the following fraudulent loans: Rodgers Finishing Tools; Rec Room; Larson Cement; Lithocraft #1, #2, and #3; Indiana Baseball Academy; and Touchton. The court concluded that Mr. Smith was responsible for $1,651,450.30 in actual loss to the SBA due to his involvement in the Rodgers Finishing Tools, Larson Cement, and Touchton loans and that Mr. Griffin was responsible for $685,022.30 due to his involvement in the Larson Cement and Touchton loans. The court ordered restitution for each defendant in accordance with the loss amount attributed to him or her. The court applied the sophisticated means enhancement to each defendant. The court sentenced each defendant to a term of imprisonment, plus a term of supervised release. The court also imposed a special assessment on each defendant and a $10,000 fine on Ms. Agee.

Each defendant timely appealed.

## II

## DISCUSSION

### A. Constructive Amendment of the Indictment

We first consider whether the Government constructively amended Count 1 of the second amended indictment at trial.[8]

The Fifth Amendment's Grand Jury Clause provides that a defendant cannot be tried on charges that are not made in the indictment. *See Stirone v. United States*, 361 U.S. 212, 217–18 (1960). "A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Rogers*, 44 F.4th 728, 735 (7th Cir. 2022) (quoting *United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998)).

Here, the defendants' constructive amendment argument is predicated on a mistaken view of the governing law regarding the requisite object of the conspiracy. The defendants submit that the Government constructively amended the indictment when it "put[] on a case to prove that the Defendants engaged in a conspiracy, the object of which *was to defraud the SBA*," while the "indicted offense … was conspiracy, the

---

[8] Because the defendants did not raise squarely a constructive amendment objection in the district court, we review for plain error and "will only reverse if the constructive amendment constituted 'a mistake so serious that but for it the [defendant] probably would have been acquitted.'" *United States v. Turner*, 836 F.3d 849, 864 (7th Cir. 2016) (quoting *United States v. Cusimano*, 148 F.3d 824, 828 (7th Cir. 1998)). We note, however, that we would reach the same result under de novo review.

object of which was to commit wire fraud affecting a financial institution in violation of 18 U.S.C. § 1349."[9] They argue that "a conspiracy, the object of which is to defraud the SBA, cannot be pursued under 18 U.S.C. § 1349" because "[t]he SBA is not a financial institution."[10]

We cannot accept this argument. Conspiracy to commit wire fraud affecting a financial institution in violation of 18 U.S.C. § 1349 can consist of defrauding the SBA; the Government does not have to prove, as the defendants suggest, that the object of the conspiracy was to defraud a financial institution. The conspiracy statute, 18 U.S.C. § 1349, provides that the object of the conspiracy must be the commission of "any offense under [the relevant] chapter," which includes wire fraud under § 1343. The statute of limitations for wire fraud is generally five years, but, if the wire fraud "affects a financial institution," a ten-year statute of limitations applies. 18 U.S.C. § 3293(2). We have explained that in a wire fraud case the "object of the fraud is not an element of the offense." *United States v. Marr*, 760 F.3d 733, 743–44 (7th Cir. 2014) (quoting *United States v. Pelullo*, 964 F.2d 193, 216 (3d Cir. 1992)). Therefore, to convict someone of wire fraud affecting a financial institution, "the wire fraud statute only requires the government to prove that a defendant intended for his or her scheme to defraud *someone*[;] a financial institution does not need to be the intended victim." *Id.* at 744; *see also United States v. O'Brien*, 953 F.3d 449, 456 (7th Cir. 2020) (discussing mail fraud affecting a

---

[9] Appellants' Joint Br. 23.

[10] Appellants' Joint Reply 1.

financial institution).[11] For wire fraud to affect a financial institution, it simply must expose the financial institution to a "new or increased risk of loss." *United States v. Serpico*, 320 F.3d 691, 694–95 (7th Cir. 2003).

At trial, the Government consistently maintained, and the district court consistently understood, the theory of the case to be that the defendants conspired to defraud the SBA by obtaining SBA guarantees for loans that did not meet the SBA's requirements and that the scheme resulted in an increased risk of loss for the financial institutions because, if the SBA discovered that a loan was ineligible and denied or repaired the guarantee, the financial institution would bear the loss.[12]

---

[11] The Supreme Court has stated that it "construe[s] identical language in the wire and mail fraud statutes *in pari materia*." *Ciminelli v. United States*, 143 S. Ct. 1121, 1126 n.2 (2023) (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005)); *see also United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006) (citing *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005)) (explaining that cases construing the mail fraud statute are equally applicable to the wire fraud statute).

[12] *See, e.g.*, R.189 ¶¶ 12, 26 (second amended indictment) ("If SBA rules were not followed, the SBA could deny the guarantee, resulting in losses to the lending institution. … The Defendants … would seek to obtain SBA guarantees for loans that did not meet SBA's guidelines and requirements."); Trial Tr. at 1587–89 (Government's closing argument) ("[T]hese banks were at a risk of loss by the defendants' fraud scheme[] because if the SBA uncovered the scheme and denied the guaranty, the banks would be on the hook for the loss to the SBA. … So what is the fraud conspiracy here? … It was the agreement to deceive the SBA in order to get the SBA to provide its valuable loan guaranties and pay out on those guaranties on the back end."); R.297 at 5–6 (district court's denial of motions for judgment of acquittal) ("[T]he evidence of a scheme to defraud the SBA (the object of the conspiracy) was overwhelming. … The parties stipulated that the banks at issue … were all qualifying financial institutions for purposes

This understanding was correct and in accordance with the principles we just have articulated.[13] The indictment was not constructively amended.

## B. Protectable Money or Property Interest

The defendants also submit that they are entitled to a judgment of acquittal because the Government did not prove that the wire fraud scheme deprived the SBA of a protectable money or property interest. As they see it, the Government chose to pursue a "right to control" theory of money or

---

of the statute criminalizing wire fraud affecting a financial institution. The banks' risk was clear from the testimony of the SBA witnesses and a lender who all said that the bank that made the loan would be the one that could be charged a repair or a complete denial of the guarantee.").

[13] We therefore also reject Ms. Isley's contentions that the indictment failed to allege sufficiently, and that the Government failed to establish, that the defendants exposed any financial institutions to a "new or increased risk of loss." Her theory is that, to expose a financial institution to a new or increased risk of loss, the defendants' misrepresentations had to cause the SBA to issue "riskier" loans that were more likely to default. She also submits that the lenders of the underlying loans were aware of the defendants' conduct. As we have explained, under the Government's theory, the defendants' scheme exposed financial institutions to the requisite new or increased risk of loss. We also reject Ms. Isley's contention that Counts 3–5 of the indictment should have been dismissed because those counts are predicated upon requests for the SBA to honor previously issued guarantees and did not create any new or increased risk of loss for a financial institution, and therefore the ten-year statute of limitations for wire fraud affecting a financial institution should not have been applied. As the Government explains, "[t]he use of the wires need not be an essential element of the scheme; it is enough if the use is 'incident to an essential part of the scheme' or 'a step in the plot.'" *United States v. Sheneman*, 682 F.3d 623, 629 (7th Cir. 2012) (quoting *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989)).

property fraud in this case—namely, "that the SBA has a property interest in making sure that its rules are followed."[14] We review this issue de novo. *See United States v. Rivera*, 901 F.3d 896, 900 (7th Cir. 2018).

The federal wire fraud statute, 18 U.S.C. § 1343, makes it a crime to use interstate wires for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." The Supreme Court has made it clear that the wire fraud statute "criminalize[s] only schemes to deprive people of traditional property interests." *Ciminelli v. United States*, 143 S. Ct. 1121, 1124 (2023) (citing *Cleveland v. United States*, 531 U.S. 12, 24 (2000)); *see also Kelly v. United States*, 140 S. Ct. 1565, 1571–74 (2020). A scheme to alter a regulatory decision, such as a scheme to obtain a state or municipal license from a government regulator or to realign access lanes to a bridge, is not one to appropriate the Government's property. *See Cleveland*, 531 U.S. at 20; *Kelly*, 140 S. Ct. at 1572. A scheme to defraud a foreign government of tax revenue, on the other hand, violates 18 U.S.C. § 1343 because "an entitlement to collect money" is "'property' as that term ordinarily is employed." *Pasquantino v. United States*, 544 U.S. 349, 355–56 (2005) (citing *McNally v. United States*, 483 U.S. 350, 358 (1987); *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004)).

In *Ciminelli*, the Supreme Court recently rejected the Second Circuit's "right to control" theory of fraud, under which a defendant could commit wire fraud if "he scheme[d] to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions." 143

---

[14] Appellants' Joint Br. 29.

S. Ct. at 1124 (quotation marks omitted).[15] Specifically, the Court reaffirmed its earlier holdings that a successful prosecution under the wire fraud statute requires the Government to prove that the defendants had engaged in a deception *and* that the object of their fraud was money or property. The right-to-control theory, held the Court, is not a sufficient substitute for money or property because, at the time of the enactment of the wire fraud statute, "[t]he so-called 'right to control' [wa]s not an interest that had 'long been recognized as property.'" *Id.* at 1127 (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)).

Contrary to the defendants' assertions, the Government did not pursue a right-to-control theory of fraud in this case; rather, the Government's allegations focused explicitly on the defendants' attempts to deprive the SBA of loan guarantees and the millions of dollars the SBA lost paying out on these loan guarantees. These allegations are explicit in the indictment,[16] in the Government's opening and closing

---

[15] We invited the parties to submit supplemental memoranda stating how, in their view, the Supreme Court's recent decision in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023), might impact our resolution of this issue.

[16] R.189 ¶¶ 26, 27 (second amended indictment) ("The Defendants … would seek to obtain SBA guarantees for loans that did not meet SBA's guidelines and requirements. … [T]he SBA incurred losses by purchasing loans that, had it known of the misrepresentations made in the loan files by the co-conspirators, it never would have guaranteed in the first place. … [T]he Defendants … originated dozens of loans, totaling over $10 million in disbursements, which were not eligible for SBA guarantees.").

statements,[17] in the proof at trial,[18] and in the instructions given to the jury by the district court.[19]

---

[17] Trial Tr. at 46–47 (Government's opening statement) ("Fraud is nothing more than lies that are told to separate someone from their money or property. Each of the defendants tricked the SBA into guaranteeing loans it never would have guaranteed had it known the truth about their lies. These guarantees were valuable. They were promises by the SBA to pay a lender for financial losses if the borrowers defaulted. … To succeed in their fraud, to ensure that banks continued to hire Banc-Serv, the defendants had to deceive the SBA into paying out on those guarantees if the loans defaulted, and succeed they did. The SBA paid out more than $2 million in fraudulent loans that had defaulted."); *id.* at 1586–89 (Government's closing argument) ("Now, fraud, very simply, is lying to get money or property, like a payout on an SBA guaranty or the guaranty itself, because, as we'll argue, the SBA guaranty itself is property. It's the SBA's right to manage its funds and guard against the risk of loss. It has a value all on its own. … So what is the fraud conspiracy here? … It was the agreement to deceive the SBA in order to get the SBA to provide its valuable loan guaranties and pay out on those guaranties on the back end.").

[18] *E.g., id.* at 89–92 (testimony of SBA official) (explaining that "[t]he government provides a guarantee of a certain percentage, and [it] will repay the lender if the loan itself that they're making defaults," that the SBA is "given a budget by … Congress … and … can make as many loans as … covers that dollar amount," and that the SBA has "run out of money to guarantee loans in a given year").

[19] R.229-1 at 25, 31 (final jury instructions) ("A scheme to defraud is a scheme that is intended to deceive or cheat another and to obtain money or property or cause the potential loss of money or property of another by means of materially false or fraudulent pretenses, representations or promises. … [E]vidence of th[e] various violations [of the SBA's rules and regulations] does not necessarily mean that a crime has been committed, but that same evidence may or may not be relevant in determining a Defendant's state of mind, and whether a Defendant acted with intent to defraud.").

The defendants latch onto some language in the Government's case, such as the Government's statement during closing arguments that the SBA guarantee is "the SBA's right to manage its funds and guard against the risk of loss."[20] Nevertheless, a fair reading of the record makes clear that the Government's case is grounded in the defendants' use of false representations to obtain loan guarantees from the SBA that would not have been granted if the true facts had been made known. These guarantees, that committed the SBA to stand behind a significant portion of the loan amount in case of default, are most certainly "property" as required by the wire fraud statute. *See, e.g.*, *Pasquantino*, 544 U.S. at 356 ("The right to be paid money has long been thought to be a species of property."); *United States v. Leahy*, 464 F.3d 773, 787–88 (7th Cir. 2006) (concluding that defendants' scheme, which caused Chicago to hire fraudulently certified contractors it would not otherwise have hired, "precisely and directly targeted Chicago's coffers and its position as a contracting party").

Ms. Isley, relying on *United States v. Kelerchian*, 937 F.3d 895 (7th Cir. 2019), additionally submits that the scheme, as alleged in the indictment and proved at trial, is outside the scope of the wire fraud statute because none of the defendants' fraudulent statements went to "essential elements" of the loan transactions, which she understands to be the creditworthiness or repayment ability of the borrowers. In *Kelerchian*, in relevant part, we considered whether submitting fraudulent statements to a machinegun manufacturer to obtain machineguns for private individuals, in violation of federal law, amounted to the deprivation of a property interest,

---

[20] Trial Tr. at 1586.

as required for wire fraud. *See id.* at 909 (citing *Cleveland*, 531 U.S. at 19). We concluded that it did, explaining that the defendant's "fraud deprived [the manufacturer] of a cognizable property interest in avoiding illegal sales of its products." *Id.* at 914. We emphasized that we decided only the issue that was before us, "focused on illegal imports of highly regulated and dangerous machineguns," and merely noted that "schemes to defraud a party into entering a contract it would not enter if it had been told the truth, but where fraudsters deliver the agreed money, goods, or services are close to the edge of the reach of the wire and mail fraud statutes." *Id.* at 913. Whatever the fate of *Kelerchian* after *Ciminelli*, we have an entirely different situation before us. As we already have explained, the Government's theory of this case was that the defendants' scheme deprived the SBA of property in the form of valuable loan guarantees that it otherwise would not have granted or paid out on.

## C. Jury Instructions

We now turn to the jury instructions. Ms. Agee first submits that the district court erred in declining to give her proposed jury instruction regarding ambiguity in the SBA's rules. We review a district court's denial of a defendant's requested jury instruction de novo. *See United States v. Lomax*, 816 F.3d 468, 475–76 (7th Cir. 2016). A defendant is entitled to a jury instruction that encompasses her theory of defense only if: "(1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the [defendant] a fair trial." *United*

*States v. Walker*, 746 F.3d 300, 307 (7th Cir. 2014) (quoting *United States v. Swanquist*, 161 F.3d 1064, 1075 (7th Cir. 1998)).

Ms. Agee proposed a jury instruction regarding ambiguity, which stated, in relevant part:

> You may find that ambiguity exists in Small Business Administration operating procedures and permitted uses of loan proceeds. If you find that ambiguity exists in the SBA protocols communicated and available to the defendant, then to prove that she conspired to defraud the agency, the government must prove beyond a reasonable doubt that there is no reasonable interpretation of the situation that would make the defendant's representations a good-faith effort to comply.[21]

The district court declined to give the instruction because it concluded that there was no evidence of ambiguity with respect to any regulation, rule, or law. Ms. Agee now submits that she was denied a fair trial because the district court "invaded the province of the jury" when it found that there was no evidence of ambiguity in any relevant rule or law.[22] In her view, there was evidence that the SBA's rules on "bridge" or "piggyback" loans were ambiguous.

We agree with the Government that the good faith instruction given by the district court adequately captured the theory

---

[21] R.163 at 34.

[22] Agee's Br. 10.

of defense reflected in Ms. Agee's proposed ambiguity in-struction—that is, that she did not have the requisite intent to defraud because she acted in compliance with a reasonable interpretation of the SBA's rules. The district court's good faith instruction stated, in relevant part:

> If a defendant acted in good faith, then the defendant lacked the intent to defraud required to prove the offenses of all counts charged in Counts 1 through 5. …
>
> A defendant acted in good faith if, at the time, the defendant honestly believed the truthfulness or validity of the statements or omissions that the government has charged as being false or fraudulent.
>
> A defendant does not have to prove his good faith; rather, the government must prove beyond a reasonable doubt that the defendant acted with the intent to defraud as charged in Counts 1 through 5.[23]

Contrary to Ms. Agee's assertion, this instruction properly allocated the burden of proof; it did not place the burden on the defendant to produce evidence of good faith. Furthermore, the district court's declining to give Ms. Agee's proposed ambiguity instruction did not deny her a fair trial. The district court properly instructed the jury on each of the elements necessary to convict Ms. Agee of each charge. And, as the Government notes, Ms. Agee did argue at trial that she believed that she was acting in compliance with a "reasonable

---

[23] R.229-1 at 32.

interpretation" of the SBA's rules.[24] The district court did not err in declining to give the proposed ambiguity instruction. *Cf. United States v. Choiniere*, 517 F.3d 967, 970–72 (7th Cir. 2008) (concluding that the district court did not err in declining to give a proposed jury instruction regarding the requirements of specific regulations because the instructions the jury received contained the defendant's theory that he did not have the intent to defraud and because the defendant presented evidence, and made arguments during closing argument, regarding his intended compliance with the regulations).

Ms. Agee also submits that her convictions on Counts 2 through 5 should be vacated because the district court's issuance of a *Pinkerton* instruction projected the "error" in the conspiracy charge (an error caused, she submits, by the Government's constructive amendment of the indictment and the district court's failure to give her ambiguity instruction) onto Counts 2 through 5.[25] She did not object to the *Pinkerton* instruction at trial, so we review only for plain error. *See United States v. Lawson*, 810 F.3d 1032, 1040 (7th Cir. 2016). Because there was no constructive amendment of the indictment and no error in declining to give the ambiguity instruction, there

---

[24] *See, e.g.,* Trial Tr. at 1648–49.

[25] *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946), holds that a person is liable for an offense committed by a coconspirator when its commission is reasonably foreseeable to that person and is in furtherance of the conspiracy.

also was no error, much less plain error, in the district court's issuance of a *Pinkerton* instruction.

## D. Sufficiency of the Evidence

Mr. Griffin and Mr. Smith each contend that they are entitled to a judgment of acquittal because there is insufficient evidence that they knowingly joined the conspiracy. We review the denial of a motion for judgment of acquittal de novo and "construe the evidence in the light most favorable to the government." *United States v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016). Our inquiry is whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *See id.*[26] We "will not reweigh the evidence or invade the jury's province of assessing credibility and will overturn the verdict only if the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Rivera*, 901 F.3d at 900–01 (cleaned up) (quoting *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016)). Although we have described the defendant's burden as a "nearly insurmountable hurdle," we also have noted that "the height of the hurdle the defendant must overcome depends directly on the strength of the government's evidence." *United States v. Vizcarra-Millan*, 15 F.4th 473, 506 (7th Cir. 2021) (quoting *United States v. Johnson*, 874 F.3d 990, 998

---

[26] *See also Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) ("[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be … to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. … [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (footnote omitted)).

(7th Cir. 2017)) (citing *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019)).

We begin with the elements of the offense. To prove conspiracy in violation of 18 U.S.C. § 1349, the Government must prove that "(1) two or more people agreed to commit an unlawful act, and (2) the defendant on trial knowingly and intentionally joined in the agreement." *United States v. Avila*, 557 F.3d 809, 814 (7th Cir. 2009). A conspiracy does not exist "when each of the conspirators' agreements has its own end, and each constitutes an end in itself." *Id.* (quoting *United States v. Sababu*, 891 F.2d 1308, 1322 (7th Cir. 1989)). "[F]or a single, overarching conspiracy to exist," the participants "must have been aware of each other and must do something in furtherance of some single, illegal enterprise." *Id.* (quoting *United States v. Bustamante*, 493 F.3d 879 (7th Cir. 2007), *overruled on other grounds by United States v. Tinsley*, 62 F.4th 376 (7th Cir. 2023)). We have explained that "a tacit agreement may support a conspiracy conviction." *United States v. Handlin*, 366 F.3d 584, 589 (7th Cir. 2004). Furthermore, an "agreement may be proved by circumstantial evidence," and "[s]uch evidence may be aimed at showing that the co-conspirators embraced the criminal objective of the conspiracy, the conspiracy continued onward towards its common goal, there were prolonged and/or cooperative relationships, or the various transactions followed a similar sequence of events." *Id.* at 589–90 (citations omitted).

We now turn to the evidence the Government presented against Mr. Griffin and Mr. Smith at trial. The Government presented evidence showing that Mr. Griffin and Mr. Smith knew the nature of the scheme to defraud the SBA. Although the Advance Pharmaceutical loan did not reach the SBA

application stage, the plan was that BBB would issue a loan to pay debt owed to the Department of Justice and the BBB loan would be paid back with proceeds from an SBA-guaranteed loan. A BBB memorandum shows that Mr. Smith approved the loan, to be used to pay off the Department of Justice debt, for underwriting by BBB. In an email to Mr. Smith, copying Mr. Griffin, Ms. Isley noted that the SBA had said that "it would be a no-no for one federal agency to guaranty a loan to pay a fine levied by another federal agency"; "the only way around this," she continued, was for BBB "to do an interim note and state it [wa]s for working capital."[27] She explained that they would "have to tell [the] SBA what the funds were used for" and therefore warned that they could "not state anywhere in [their] note it [wa]s for the payment of a government agency fine."[28] Furthermore, when the SBA denied Banc-Serv's request for additional working capital on the Hefner Financial loan because it realized the funds would be used to pay debt that was ineligible for SBA assistance, Ms. Agee forwarded the SBA's letter, copying Mr. Griffin, and wrote: "They got us …."[29]

The Government also presented evidence showing the involvement of both Mr. Griffin and Mr. Smith in the scheme to disguise the payment of back taxes as working capital for the Larson Cement loan. Ms. Agee copied both Mr. Griffin and Mr. Smith on an email in which she explained that they could

---

[27] R.423-17 at 1.

[28] *Id.*

[29] R.423-21 at 1, 3.

"not show [they we]re paying past due taxes" and so the funds "would have to be categorized as working capital" and they "would have to justify what the eligibility of this much working capital would be used for."[30] Ms. Agee, copying Mr. Griffin, then indicated that she would review the loan paperwork "with Chad [Griffin] when he return[ed]."[31] Mr. Griffin, copying Mr. Smith, then sent an email stating that they needed "the use of proceeds in the write-up to say the funds that w[ould] be used to pay the Accrued Liabilities (Payroll Taxes) [we]re for working capital" because the SBA would not allow the payment of "back taxes with loan proceeds" and the SBA would "trace this back to the tax returns."[32] After the lender requested that Banc-Serv set aside the SBA application until further notice because the IRS had filed a lien, Ms. Agee emailed Mr. Griffin, copying Mr. Smith, and stated that, "[p]er Matt [Smith]," they were "going to move forward with the current SBA application as is and try to do everything simultaneously."[33] Mr. Smith's signature also appears on two letters to the SBA and two SBA loan application documents in connection with the Larson Cement loan, although there is evidence suggesting that Ms. Agee signed his name on some of these documents. The SBA faxed the loan authorization to Mr. Smith at BBB.

---

[30] R.432-8 at 2.

[31] *Id.* at 1.

[32] R.424-1 at 1.

[33] R.424-2 at 1.

The Government also presented evidence connecting Mr. Griffin and Mr. Smith to the plan to disguise the fact that Touchton loan proceeds would be used to pay past-due federal payroll taxes. A BBB memorandum, which noted that the loan would be used to pay off the taxes, indicated that Mr. Smith approved the loan for underwriting by BBB. After Mr. Griffin emailed the loan application to the SBA, the SBA sent him a screen-out letter, stating that it was unable to process the loan application because "SBA loan proceeds [cannot] be used to pay past-due Federal and state payroll taxes."[34] The letter requested "proof that a repayment plan with the IRS ha[d] been made and source and terms of funds that w[ould] be used to pay the past-due payroll tax."[35] Mr. Griffin responded that "[t]he past due taxes w[ould] be paid with proceeds from the Line of Credit provided by Bridge Business Bancorp" and that the taxes "should not have been part of the SBA use of proceeds."[36] The SBA sent the loan authorization for the Touchton loan to Mr. Griffin. Emails from Ridgestone Bank, which Ms. Agee forwarded to Mr. Griffin, stated that Ridgestone needed BBB "to provide an interim loan … to pay off delinquent taxes from Touchton Industries" and that Ridgestone would "pay off the interim loan from SBA proceeds, once [it] receive[d] evidence from the proper taxing

[34] *See* R.425-28; R.425-29 at 3.

[35] R.425-29 at 3.

[36] *Id.* at 1.

authority that the delinquent taxes ha[d] been paid."[37] Ridgestone noted that this was a "requisite from the SBA" and that they did "not want to jeopardize the authorization."[38] Approximately two weeks later, Mr. Smith sent an email to Ridgestone in which he proposed using a BBB loan to pay off the IRS and "Ridgestone Bank, would then, (so long as they ha[d] received the stamped letter from the IRS, acknowledging that the IRS ha[d] received the $157,366.72), on the next business day, close the … SBA Loan, and pay down the" BBB loan.[39] In that email, he stated that he was copying Ms. Agee for Banc-Serv's "concurrence on the structure of the closing as it relates to compliance with the SBA Authorization."[40] Ridgestone responded and asked whether the proposed plan "follow[ed] the terms of the SBA authorization" and what "the use of proceeds in the authorization" was.[41] Ms. Agee responded to Mr. Smith and Ridgestone, copying Mr. Griffin, that the SBA use of proceeds provided for "working capital which c[ould] payoff Bridge," among other costs.[42]

The Government also presented evidence of Mr. Smith's participation in fraud with respect to the Rodgers Finishing Tools loan. The Government presented the testimony of

---

[37] R.425-17 at 1.

[38] *Id.*

[39] R.425-18 at 2.

[40] *Id.* at 2–3.

[41] *Id.* at 2.

[42] *Id.* at 1.

Bradley Crawford, who sought an SBA-guaranteed loan to purchase the Rodgers Finishing Tools business. To obtain the loan, the SBA required him to inject at least $50,000 into the business as equity capital. Crawford, however, did not have the necessary $50,000. He testified that, on a phone call with Ms. Agee and Mr. Smith, who was still at Banc-Serv at that time, he was instructed to bring a $50,000 personal check to the loan closing, which would be reimbursed from the working capital portion of the loan upon close. Although Crawford testified that "Kerri [Agee] was the majority of the conversation" and he could not recall anything specific that Mr. Smith said during the phone conversation, he was clear that "[b]oth talked," estimating that Mr. Smith was responsible for twenty percent of the conversation.[43]

Given the evidence the Government presented at trial, we conclude that neither Mr. Griffin nor Mr. Smith is entitled to a judgment of acquittal. The Government presented sufficient evidence, viewed as a whole and in the light most favorable to the Government, from which a rational juror could conclude beyond a reasonable doubt that both Mr. Griffin and Mr. Smith knowingly joined the conspiracy. Although the evidence is not overwhelming with respect to Mr. Smith,[44] a juror could conclude, based on the evidence in the record, that Mr. Smith, with knowledge of the scheme to defraud, participated in moving the loan transactions forward.

---

[43] Trial Tr. at 994–95, 1050–52.

[44] We are mindful of the role that Mr. Smith appears to have played in this scheme. Although Mr. Smith was not employed at Banc-Serv during much of the conduct at issue in this case, he facilitated the fraudulent transactions in his role as a lender working with Banc-Serv.

**E.  Sentencing Arguments**

Finally, we turn to the defendants' sentencing arguments. They contend that the district court erred in calculating the loss amount for purposes of the loss enhancement under U.S.S.G. § 2B1.1(b), in calculating restitution, in applying the sophisticated means enhancement to Mr. Griffin and Mr. Smith, and in imposing a condition of supervised release on Mr. Griffin in the amended final judgment that is different than the condition announced at his sentencing hearing. We consider each contention in turn.

**i.  Loss Amount**

The defendants submit that the district court should not have applied a loss enhancement under U.S.S.G. § 2B1.1(b) in connection with the Touchton, Larson Cement, Rodgers Finishing Tools, Lithocraft #2, and Lithocraft #3 loans because the Government failed to prove that the defendants had caused the SBA's actual loss on those loans. We review legal interpretations of the Sentencing Guidelines de novo and factual findings as to loss amount for clear error. *See United States v. Moose*, 893 F.3d 951, 954 (7th Cir. 2018) (citing *United States v. White*, 883 F.3d 983, 986 (7th Cir. 2018)). The Government has the burden of proving the amount of loss by a preponderance of the evidence. *See United States v. Williams*, 892 F.3d 242, 250 (7th Cir. 2018) (quoting *United States v. Johns*, 686 F.3d 438, 454 (7th Cir. 2012)). "When calculating the loss for purposes of sentencing, the district court is only required to make 'a reasonable estimate of the loss.'" *United States v. Love*, 680 F.3d 994, 999 (7th Cir. 2012) (quoting *United States v. Green*, 648 F.3d 569, 583 (7th Cir. 2011)).

The Sentencing Guidelines provide that, for fraud crimes, a defendant's offense level should be increased according to the amount of "loss" resulting from the offense. *See* U.S.S.G. § 2B1.1(b). "Loss" is the "greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. n.3(A). "Actual loss," which the district court employed in this case, is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. n.3(A)(i). Pecuniary harm is "reasonably foreseeable" if "the defendant knew or, under the circumstances, reasonably should have known," that it "was a potential result of the offense." *Id.* § 2B1.1 cmt. n.3(A)(iv). We have explained that, in the determination of loss amount, "[c]ausation includes two distinct principles, cause in fact, commonly known as 'but for' causation, and legal causation." *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006).

The defendants first contend that their conduct did not cause the SBA's loss because their misrepresentations did not "skew the SBA's credit evaluation" of the loans.[45] In the

---

[45] Appellants' Joint Br. 35. The defendants submit that our recent decision in *United States ex. rel. Calderon v. Carrington Mortgage Services, LLC*, 70 F.4th 968 (7th Cir. 2023), supports their actual loss arguments. In *Calderon*, we affirmed a grant of summary judgment for a defendant sued under the False Claims Act because the plaintiff had not presented evidence from which a jury could conclude that the defendant's misrepresentations regarding certifications of residential mortgage loans for insurance coverage caused the subsequent defaults of the loans. *Id.* at 981. (The plaintiff had abandoned reliance on any other basis for establishing causation.) In reaching that conclusion, we relied on our decision in *United States v. Luce,* 873 F.3d 999, 1014 (7th Cir. 2017), which in turn had followed *United States v. Miller*, 645 F.2d 473 (5th Cir. 1981), and *United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977). We stressed throughout *Luce* that we were dealing with

defendants' view, the Government was required to prove that it was reasonably foreseeable that the defendants' misrepresentations would increase the "riskiness," or the likelihood of default, of the loans. Without evidence that the defendants violated a rule related to borrower creditworthiness, the defendants continue, the Government cannot show that it was reasonably foreseeable to any defendant that a particular misrepresentation on an application caused the SBA to take on excess risk.

The district court did not err in determining the loss amounts caused by the defendants' fraud. The defendants present an artificially narrow theory of causation. The SBA provides loan guarantees to borrowers who cannot obtain traditional financing because banks consider them "risky"; in light of this risk, the SBA demands that these borrowers meet certain requirements in order to be eligible to obtain a guarantee. At sentencing, the district court, accepting the Government's position, found that all of the loans included in the loss amount, with the exception of the Indiana Baseball Academy loan, would have been ineligible for any SBA guarantees without the defendants' fraudulent misrepresentations.[46] For example, an SBA official testified that a $50,000 equity injection was a threshold requirement to receive the $1.4 million SBA-guaranteed loan used to purchase the Rodgers Finishing Tools business; the defendants hid from the SBA that the borrower did not have $50,000 to contribute. The defendants also hid that Larson Cement and Touchton had past-due payroll

---

the language of the False Claims Act. *Calderon* is therefore hardly on point because it deals specifically with the language of the False Claims Act.

[46] *See* Isley's Sentencing Tr. at 14–17.

taxes, which, without a payment plan with the IRS, disqualified them from receiving any SBA guarantee. The court therefore concluded that the defendants' fraud caused the loss that the SBA suffered when it purchased the outstanding balance on each of the loans that was in fact ineligible for any SBA guarantee.[47] As the court explained, the Government's theory at trial and the "evidence presented to the jury was that Banc-Serv, through fraudulent and fictitious means, secured SBA loans for certain borrowers who were ineligible for any SBA-guaranteed loan and that the SBA would not have paid out the guarantees at all but for the defendant[s'] fraud."[48] It also was reasonably foreseeable to the defendants that, as a result

---

[47] The district court's explanation of the loss amount echoes that of the Probation Office. In response to the defendants' objection to the loss amount in the PSRs, the Probation Office stated that the "funds obtained by the borrowers" were secured "through the fraudulent packaging and servicing of the loans by these defendants." R.302 at 33; R.312 at 34; R.314 at 36; R.316 at 34; R.320 at 42. Furthermore, "the defendants packaged and serviced loan applications with the knowledge" that the borrowers "could not obtain an SBA loan by legal standards" and, therefore, they secured these loans although they "knew the risks of their fraudulent activities and were aware of the likelihood these borrowers could default." R.302 at 33; R.312 at 34; R.314 at 36; R.316 at 34; R.320 at 42. The Probation Office stated that "these borrowers never would have been granted an SBA loan" had the defendants "not fraudulently and illegitimately altered applications." R.302 at 33; R.312 at 34; R.314 at 36; R.316 at 34; R.320 at 42. At the defendants' sentencing hearings, the district court adopted the Probation Office's calculation of the loss amount and concluded that the Government had proven the loss amount by a preponderance of the evidence.

[48] Isley's Sentencing Tr. at 14; *see also* Agee's Sentencing Tr. at 8; M. Smith's Sentencing Tr. at 15; Griffin's Sentencing Tr. at 14.

of their fraudulent conduct, the SBA would pay out on these ineligible loans. As the district court noted, the defendants "knew the risks of their fraudulent activities and were aware of the likelihood that these SBA-ineligible borrowers might default, yet they lied and, through fraudulent actions, secured these fraudulent loans regardless."[49]

The district court recognized that the posture of the Indiana Baseball Academy loan was different than the other loans included in the loss amount calculation because, although Indiana Baseball Academy diverted loan proceeds to an improper use, that diversion did not affect the basic eligibility of Indiana Baseball Academy to receive an SBA-guaranteed loan.[50] With respect to that loan, the defendants disguised that the borrower would divert approximately $108,000 of the $350,000 loan to pay off student loans by labeling the funds as "working capital" at the application stage. They then renewed this lie to the SBA, insisting that the funds had not been used to pay student loans, so that the SBA would purchase the entire outstanding balance of the loan. The district court accepted the Government's position that it was reasonably foreseeable that the diversion of almost one-third of the loan proceeds from the funding of the day-to-day operations of the business to the payment of unrelated student loans would

---

[49] M. Smith's Sentencing Tr. at 15; *see also* Isley's Sentencing Tr. at 15; Griffin's Sentencing Tr. at 14.

[50] The Indiana Baseball Academy loan was included in the loss amounts for Ms. Agee, Ms. Isley, and Ms. Smith.

lead to the business defaulting on the loan.[51] The defendants therefore were responsible for the SBA's total loss in connection with this loan. The district court did not clearly err in concluding that the defendants' fraudulent conduct caused the loss that the SBA suffered by purchasing the outstanding balance on any of these loans.[52]

The defendants further submit that the Government presented no evidence connecting Lithocraft loans #2 and #3 to the defendants' scheme to defraud the SBA. "A loss determination must be based on the conduct of conviction and relevant conduct that is criminal or unlawful, and the

---

[51] *See* Isley's Sentencing Tr. at 10–11, 16.

[52] *Cf. United States v. Dehaan*, 896 F.3d 798, 807–08 (7th Cir. 2018) (finding no plain error where the district court calculated the loss amount resulting from the defendant's fraudulent certification of patients as homebound to be the entire amount Medicare paid for those ineligible recipients because "[a]bsent a proper certification, a patient is not eligible for [home health] services … whether he is actually homebound or not" and so "one may see the entire amount paid by Medicare for services to these patients as a loss even if, in theory, some number of these patients were in fact homebound and could therefore have qualified for home services had they been certified as homebound in good faith by an honest physician"); *United States v. Kosth*, 257 F.3d 712, 722 (7th Cir. 2001) (concluding under U.S.S.G. § 2F1.1(b), which was consolidated with § 2B1.1 in 2001, that, for a defendant who was convicted of making false statements in connection with loans from the SBA, the district court did not clearly err in applying a loss amount that reflected the amount the defendant "received or had commitments to receive … from the SBA when all was said and done"); *United States v. Morris*, 80 F.3d 1151, 1171–74 (7th Cir. 1996) (concluding, under U.S.S.G. § 2F1.1(b), that, even if the defendants' conduct did not cause a bank's ultimate demise, the defendants' fraudulent conduct facilitated the bank's offering of subordinated capital notes and caused investors to put at risk the full value of their investments).

government must demonstrate by a preponderance of the evidence that the loss amount is attributable to that criminal or unlawful conduct." *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013) (citing *United States v. Littrice*, 666 F.3d 1053, 1060 (7th Cir. 2012)). As the PSRs detailed and the district court noted at sentencing, the Government presented evidence that, when a Banc-Serv employee in the process of liquidating all three Lithocraft loans discovered that the Lithocraft "file [wa]s missing the [required] environmental assessment," Ms. Isley directed the employee to ask the bank involved to complete a backdated environmental assessment so that the SBA would not charge a repair fee.[53] The district court did not clearly err in including Lithocraft loans #2 and #3 in the loss amount.

As an alternative basis on which to challenge the loss amount,[54] the defendants submit that the district court erred

---

[53] R.424-24 at 1–2.

[54] The defendants also submit that the district court erred in including certain guarantee fees and interest amounts in the loss amount. They note that, under U.S.S.G. § 2B1.1 cmt. n.3(D)(i), "[l]oss shall not include … [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." They concede, however, that any changes in loss amount caused by these alleged errors alone would not result in any change in any defendant's Guidelines range. Therefore, because we conclude that there were no other errors with respect to any defendant's loss amount, we need not consider whether the district court erred by including guarantee fees and interest amounts in the loss amount. *See, e.g.*, *United States v. Klund*, 59 F.4th 322, 329 (7th Cir. 2023) (concluding that we did not need to address whether the district court erred in failing to offset the value of certain goods in its calculation of the defendant's intended loss amount because the offset "would not affect his guidelines range"). We consider their

in its calculation of loss because it did not apply the government benefits rule properly. The "government benefits rule" in the Sentencing Guidelines provides:

> In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1 cmt. n.3(F)(ii). The defendants contend that, under the government benefits rule, the actual loss amounts for the Touchton, Rodgers Finishing Tools, and Indiana Baseball Academy loans should be only the amount of the loan proceeds that were used for an improper purpose. Their argument is based on their belief that the SBA would have repaired, rather than denied, these loans had the disclosures been accurate because, according to the testimony of an SBA official, "a denial is for loans that are not eligible or if the fraud *caused* a complete harm on the loan."[55]

As we already have explained, however, the district court found that all of the loans included in the loss amount fell into one of the two categories of loans that the defendants admit

---

contentions regarding these calculation errors with respect to restitution, *infra*.

[55] Appellants' Joint Br. 45 (citing Trial Tr. 1194–95).

the SBA would have denied. The court concluded that, with the exception of Indiana Baseball Academy, the loans that the SBA purchased were ineligible for any amount of SBA guarantee.[56] And, with respect to Indiana Baseball Academy, the defendants intentionally disguised the diversion of one-third of the loan proceeds from business uses, which, the district court accepted, caused the entire loan to default shortly thereafter. The district court did not clearly err in these conclusions. We therefore reject the defendants' government benefits rule argument.

### ii. Restitution

The defendants also contend that the district court erred in calculating and ordering restitution.[57] We review the calculation of restitution for abuse of discretion, viewing the evidence in the light most favorable to the Government. *United*

---

[56] As the district court noted, our decision in *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006), is instructive. There, the defendant had engaged in a scheme to cheat the City of Chicago out of funds slotted for minority- and women-owned businesses. We concluded, in relevant part, that an earlier version of the government benefits rule—stating that "[i]n a case involving diversion of government program benefits, loss is the value of the benefits diverted from intended recipients or uses"— applied. *See id.* at 790. We explained that, under that rule, the loss amount should have been the total value of the benefits diverted from intended recipients or uses, *not* the "contract price minus the benefit provided." *Id.* As in *Leahy*, the government funds in this case were diverted to improper recipients; the loans that the SBA purchased were ineligible for any amount of SBA guarantee.

[57] The defendants submit that any change in the actual loss calculation also must be applied to restitution. Because we reject the defendants' arguments for a change in the actual loss calculation, we also reject their argument requesting a change in the restitution amount on this basis.

*States v. Robl*, 8 F.4th 515, 527 (7th Cir. 2021). We "will only upset an order of restitution 'if the district court used inappropriate factors or did not exercise discretion at all.'" *United States v. Stein*, 756 F.3d 1027, 1029 (7th Cir. 2014) (quoting *United States v. Frith*, 461 F.3d 914, 919 (7th Cir. 2006)). Where a defendant failed to raise a specific argument regarding a restitution award in the district court, we employ plain-error review. *See Walker*, 746 F.3d at 308 (citing *United States v. Berkowitz*, 732 F.3d 850, 852 (7th Cir. 2013)).

The Mandatory Victim Restitution Act ("MVRA") requires the defendants to "make restitution to the victim of the offense." *See* 18 U.S.C. § 3663A(a)(1). "[T]he primary and overarching purpose of the MVRA is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *United States v. Robers*, 698 F.3d 937, 943 (7th Cir. 2012) (cleaned up) (quoting *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006)). The MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). We have explained that the "MVRA has a proximate cause requirement" and a district court's failure to "address proximate causation during sentencing," at least where "there is no way of knowing if [the defendant] caused the victims' full loss," affects the defendant's "substantial rights." *United States v. Burns*, 843 F.3d 679, 689 (7th Cir. 2016).

The MVRA "applies to a victim's losses from the offense of conviction, which is narrower than relevant conduct under the Guidelines" for loss amount. *White*, 883 F.3d at 992. In other words, "[r]estitution is 'limited to the actual losses

caused by the specific conduct underlying the offense.'" *United States v. Meza*, 983 F.3d 908, 918 (7th Cir. 2020) (quoting *Orillo*, 733 F.3d at 244). When the offense "involves as an element a scheme, conspiracy, or pattern of criminal activity," a court should order restitution for "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Therefore, "[a]s long as the [sentencing] court can adequately demarcate the scheme, it can order restitution for any victim harmed by the defendant's conduct during the course of that scheme." *United States v. Smith*, 218 F.3d 777, 784 (7th Cir. 2000). Because "the crime comprehended by the mail and wire fraud statutes is the scheme to defraud, not just the isolated iterations of wire transmissions or mailings, … restitution for victims of the overall scheme is required." *Meza*, 983 F.3d at 918 (quoting *United States v. Locke*, 643 F.3d 235, 247 (7th Cir. 2011)).

The Government must establish the restitution amount by a preponderance of the evidence. *See Robl*, 8 F.4th at 527. "A court may rely on the information provided in the presentence report 'so long as it is well supported and appears reliable.'" *Id.* at 529 (quoting *United States v. Scalzo*, 764 F.3d 739, 745 (7th Cir. 2014)). "A defendant bears the burden of showing that the [presentence report] is inaccurate or unreliable, and a simple denial of its accuracy does not discharge this burden." *Id.* "If the defendant is able to create 'real doubt as to the information's reliability,' the burden shifts to the government to demonstrate the accuracy of the presentence report's restitution information." *Id.*

In this appeal, the defendants submit, for the first time, that the district court should not have included the Larson

Cement loan in the calculation of the restitution amount because that loan did not affect a financial institution. In the Larson transaction, the defendants disguised the payment of past-due payroll taxes as "working capital." The district court did not plainly err in concluding that the defendants' misrepresentations in connection with the Larson loan were part of their overall scheme to obtain SBA guarantees for loans that did not meet the SBA's guidelines and requirements. *Cf. United States v. Peugh*, 675 F.3d 736, 742 (7th Cir. 2012), *rev'd on other grounds*, 569 U.S. 530 (2013), *opinion reinstated in part*, 527 F. App'x 554 (7th Cir. 2013) ("When a 'scheme' is an element of the offense of conviction—as it is in bank fraud, *see* 18 U.S.C. § 1344—the Mandatory Victim Restitution Act requires restitution for the losses caused by the *entire* scheme, even if the defendant is not convicted of all of the conduct that caused loss."); *United States v. Belk*, 435 F.3d 817, 819 (7th Cir. 2006) ("The 'crime' covered by § 1341 is the *scheme* to defraud, not (just) the mailings that occur in the course of the scheme. This indictment laid out, and the jury convicted Belk of, a multi-year scheme to defraud …. Restitution for the whole scheme is in order.").

The defendants also submit that the district court abused its discretion in finding proximate cause between the defendants' conduct and any loss to the SBA. Because we already have concluded that the defendants' fraudulent misrepresentations caused the SBA's loss in our discussion of the loss amount under U.S.S.G. § 2B1.1(b), we now address only the new contention that the defendants raise with respect to restitution. In this respect, the defendants submit that the SBA's failure to try to recoup from the lenders purportedly improper guarantee payments is an independent intervening act

that breaks the chain of causation between the defendants' conduct and the SBA.

The district court did not abuse its discretion in determining that there was proximate cause between the defendants' conduct and the SBA's loss without consideration of the ability of the SBA to recoup losses from lenders. The MVRA provides that "[i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution." 18 U.S.C. § 3664(f)(1)(B). We therefore have explained that, "when determining the restitution amount the court is confined to considering (1) the property or value of property lost by the victim and (2) the value of property returned from the defendant to the victim, but not the victim's receipt of property from third parties." *United States v. Malone*, 747 F.3d 481, 485 (7th Cir. 2014); *see also United States v. Johnson*, 911 F.3d 849, 852 (7th Cir. 2018) (explaining that § 3664(f)(1)(B) "is a statutory version of the collateral-source doctrine, familiar in tort law").

The defendants finally contend that the district court erred by including guarantee fees and interest amounts in the restitution amount. We need not consider this argument because it is completely undeveloped, both in the district court record and on appeal. *See, e.g.*, *United States v. Butler*, 58 F.4th 364, 368 (7th Cir. 2023) (explaining that arguments that are undeveloped on appeal are waived). In any event, the district court did not abuse its discretion in calculating restitution by relying on the outstanding balance amounts that the PSRs stated the SBA purchased for each loan.

### iii. Sophisticated Means Enhancement

Mr. Griffin and Mr. Smith submit that the district court erred in applying the "sophisticated means" enhancement under U.S.S.G. § 2B1.1(b)(10)(C) to their sentences. We review de novo the application of the Guidelines, *see Sheneman*, 682 F.3d at 630, and we review for clear error the district court's finding that the offense involved sophisticated means, *see United States v. Sykes*, 774 F.3d 1145, 1152 (7th Cir. 2014). "[A] district court need only find by a preponderance of the evidence facts sufficient to support the enhancement." *United States v. Friedman*, 971 F.3d 700, 717 (7th Cir. 2020) (quoting *United States v. Sewell*, 780 F.3d 839, 848 (7th Cir. 2015)).

The "sophisticated means" enhancement applies if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). The Sentencing Commission added the requirement that the defendant "intentionally engaged in or caused the conduct constituting sophisticated means" in 2015 to clarify that application of this enhancement should be based "on the defendant's own intentional conduct" rather than "on the basis of the sophistication of the overall scheme without a determination of whether the defendant's own conduct was 'sophisticated.'" U.S.S.G. Supp. App. C, Amdt. 792 (Reason for Amendment). An application note explains that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B). The enhancement "does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual [fraud] case." *United States v. Lundberg*, 990 F.3d 1087, 1097 (7th Cir. 2021) (quoting *United*

*States v. Fife*, 471 F.3d 750, 754 (7th Cir. 2006)); *see also United States v. Bickart*, 825 F.3d 832, 837–38 (7th Cir. 2016) (quoting *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001) ("'[S]ophistication' refers 'to the presence of efforts at concealment that go beyond (not necessarily far beyond, for it is only a two-level enhancement …) the concealment inherent in [the] fraud.'"). Application of the sophisticated means enhancement is not limited to "only the mastermind of the scheme." *United States v. Muresanu*, 951 F.3d 833, 840 (7th Cir. 2020).

Mr. Griffin and Mr. Smith each contend that the district court erred in its application of the sophisticated means enhancement to his sentence because it considered the sophistication of the conspiracy as a whole rather than considering whether each defendant "intentionally engaged in or caused the conduct constituting sophisticated means," as required by U.S.S.G. § 2B1.1(b)(10)(C). At each defendant's sentencing hearing, the district court stated that it looked at "the overall scheme to evaluate sophistication" under Seventh Circuit case law.[58] At Mr. Griffin's sentencing hearing, the court specifically cited *United States v. Wayland*, 549 F.3d 526 (7th Cir. 2008), which, Mr. Griffin notes, predates the 2015 amendment to the sophisticated means enhancement.

After reviewing the relevant parts of the transcript, we are confident that the district court neither misunderstood the governing principle nor misapplied that principle. Taken in context, the district court's statement that it looked at "the overall scheme to evaluate sophistication" clearly meant that it would evaluate the individual defendant's conduct as a whole in the context of the overall scheme. Indeed, in

---

[58] M. Smith's Sentencing Tr. at 26; Griffin's Sentencing Tr. at 35.

*Wayland*, we affirmed the application of the sophisticated means enhancement to a defendant who singlehandedly had perpetrated a healthcare fraud scheme because, "[e]ven if [his] individual actions could be characterized as unsophisticated, … his overall scheme, which lasted nine years and involved a series of coordinated fraudulent transactions, was complex and sophisticated." 549 F.3d at 529. The 2015 amendment to the sophisticated means enhancement did not affect the principle that a district court can look to a defendant's conduct as a whole to evaluate sophistication. *See, e.g.*, *United States v. Redman*, 887 F.3d 789, 793 (7th Cir. 2018) (quoting *United States v. Ghaddar*, 678 F.3d 600, 602 (7th Cir. 2012)) ("[N]ot all of [the defendant's] actions needed to be elaborate for the adjustment to apply; it is enough that, as the district court found, his actions when viewed as a whole constituted a sophisticated scheme."). The appropriate inquiry therefore was whether, in the context of the overall scheme, the individual defendant's conduct, evaluated as a whole, was sophisticated.

In imposing the sophisticated means enhancement, the district court properly considered the conduct that Mr. Griffin and Mr. Smith each intentionally engaged in or caused within the context of the overall scheme. At Mr. Smith's sentencing hearing, for example, the district court noted that he, with Ms. Agee, had "instructed" the owner of Rodgers Finishing Tools to use $50,000 of the "loan proceeds designated as working capital" to fund a personal check ostensibly offered as the required equity injection so that it "appear[ed] as though Rodgers Finishing Tools had made the $50,000 equity

injection when they had not, in fact, done so."[59] The court also stated that, although "[m]aybe someone else had introduced it to him," "it was Mr. Smith who introduced [the bridge loan structure] to his co-conspirators on the Touchton loan by which … Mr. Smith's company issue[d] a … loan that would be temporarily used to pay off past due payroll taxes and which, itself, would be paid off by the SBA loan."[60] At Mr. Griffin's sentencing hearing, the district court noted that Mr. Griffin also was involved in the "use [of] a bridge loan structure, which is sophisticated means, on the Touchton loan."[61] The court also discussed his involvement in the Larson Cement loan. The court noted that he had concealed "using working capital to repay delinquent IRS withholding taxes" and "purposely left the box unchecked regarding using the funds for repayment of delinquent taxes" on the SBA loan application.[62] It is clear that Mr. Griffin and Mr. Smith had insinuated themselves into the overall conspiracy. The district court did not clearly err in determining that Mr. Griffin and Mr. Smith each intentionally engaged in conduct constituting sophisticated means as part of the scheme to defraud the SBA.[63]

---

[59] M. Smith's Sentencing Tr. at 26.

[60] *Id.* at 27.

[61] Griffin's Sentencing Tr. at 35.

[62] *Id.*

[63] *Cf. Ghaddar*, 678 F.3d at 603 (concluding that the use of "elaborate tactics to conceal the source of … money" constitutes sophisticated means); *United States v. Reichel*, 911 F.3d 910, 918 (8th Cir. 2018) ("[The defendant's]

### iv. Clerical Error in Mr. Griffin's Amended Judgment

Mr. Griffin and the Government agree that the district court erred in imposing a condition of supervised release on Mr. Griffin in the amended final judgment that is different than the condition announced at his sentencing hearing. We review de novo a claim of an inconsistency between an oral and written judgment, and "where the oral pronouncement of the court conflicts with the court's later written order, the oral pronouncement controls." *United States v. Sanchez*, 814 F.3d 844, 847 (7th Cir. 2016). Furthermore, when "the written judgment failed to capture accurately the unambiguous oral pronouncement," Federal Rule of Criminal Procedure 36 "allows for correction of such a clerical error at any time." *United States v. Medina-Mora*, 796 F.3d 698, 700 (7th Cir. 2015).

At Mr. Griffin's sentencing hearing, the district court proposed a supervised release condition requiring Mr. Griffin to "participate in a mental health evaluation and any treatment program deemed necessary."[64] Condition 14 of supervised release in the first written judgment properly provided that Mr. Griffin was required to "participate in a mental health evaluation and treatment if deemed necessary."[65] Condition 14 in the amended judgment, which was modified only with respect to Mr. Griffin's requested correctional facility,

---

multi-year use of bridge loans from one investor to cover the debts of another constituted sophisticated means for the wire fraud counts.").

[64] Griffin's Sentencing Tr. at 38.

[65] R.333 at 4.

required him to "participate in a mental health treatment program."[66]

We agree that the omission of "if deemed necessary" from the mental health condition in the amended judgment was erroneous. Condition 14 in Mr. Griffin's amended judgment should match Condition 14 as written in the first judgment. We modify the judgment in Mr. Griffin's case so that Condition 14 requires that he "participate in a mental health evaluation and treatment if deemed necessary."

### Conclusion

For the foregoing reasons, we affirm the defendants' convictions and sentences, except that we modify the amended judgment in Mr. Griffin's case so that Condition 14 of supervised release requires that he "participate in a mental health evaluation and treatment if deemed necessary."

AFFIRMED

---

[66] R.346 at 4.